729 A.2d 910

**Clarence CONYERS, Jr.**

v.

**STATE of Maryland.**

**No. 27, Sept. Term, 1998.**

Court of Appeals of Maryland.

May 17, 1999.

134

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

Clarence Conyers, Jr. (Appellant) was convicted in the Circuit Court for Wicomico County of premeditated murder, felony murder, first-degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, robbery, attempted robbery, and use of a handgun in the commission of a crime of violence with respect to Wanda Johnson. In the same proceeding, Appellant was convicted of premeditated murder and use of a handgun in the commission of a crime of violence as to Lawrence Bradshaw. Appellant was sentenced to death for the murder of Johnson and to life without the possibility of parole for the murder of Bradshaw. On direct appeal, this Court reversed the burglary conviction and set aside the death sentence, remanding the case for a new sentencing proceeding in accordance with Maryland Code (1957, 1996 Repl.Vol., 1998 Supp.), Article 27, § 413.[1] We affirmed the other judgments. *Conyers v. State*, 345 Md. 525, 693 A.2d 781 (1997)(hereinafter "*Conyers I* ").

On January 17 and January 26–28, 1998, the Circuit Court for Wicomico County, the Honorable D. William Simpson presiding with a jury as requested by Appellant, conducted the new capital sentencing proceeding. Appellant was again sentenced to death for the Wanda Johnson murder. This appeal comes to this Court pursuant to Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 414. Appellant presents the following twelve issues for review:

---

**1.** Unless otherwise indicated, all statutory references are to Maryland Code (1957, 1996 Repl.Vol., 1998 Supp.), Article 27.

1. Whether Appellant was deprived of a fair hearing because of Detective Philip Marll's testimony regarding prosecution witness Charles Johnson.

2. Whether the trial court erroneously restricted the direct examination of defense witness Arthur Rogers.

3. Whether the trial court erroneously restricted the direct examination of defense witnesses Ventura McLee and Eric Spencer.

4. Whether the trial court erroneously instructed the jury that a mitigating circumstance of sympathy or mercy must be based on evidence.

5. Whether the trial court erroneously refused to admit the proffered testimony of Professor Steven Grossman and erroneously refused to propound the requested jury instruction regarding his testimony.

6. Whether Appellant was deprived of a fair hearing when victim impact witness Victoria Gibson purportedly conveyed to the jury that Appellant had previously been sentenced for the murder of Wanda Johnson.

7. Whether the trial court erroneously admitted "other crimes" evidence, consisting of Monica Wilson's testimony that Appellant engaged in domestic violence.

8. Whether the trial court erroneously denied Appellant's motion to preclude evidence that Appellant had been convicted of the murder of Lawrence Bradshaw.

9. Whether the trial court erroneously admitted photographs of Wanda Johnson and the crime scene.

10. Whether the trial court committed plain error in permitting the State to impeach defense witness Arthur Rogers with prior convictions for first and second-degree sexual assault.

11. Whether the trial court erroneously denied Appellant's motion to prevent introduction of Appellant's statement to Monica Wilson regarding a .38 caliber handgun.

12. Whether Maryland's death penalty statute is unconstitutional.

Following a summary of the pertinent facts, we shall address the above issues *seriatim.*

## I. BACKGROUND

The facts underlying Appellant's conviction for the murder of Wanda Johnson were set forth in our opinion in *Conyers I, supra:*

"At approximately 9:35 p.m. on Friday, October 21, 1994, Appellant's estranged girlfriend, Monica Wilson, went to visit her mother, Wanda Johnson, at the home Ms. Johnson shared with her husband, Elwood Johnson. Ms. Wilson had just spoken with her mother at 9:00 p.m. that evening, and her mother had agreed to babysit for Ms. Wilson's son. Arriving with Ms. Wilson at the Johnson home was her cousin, Carla Clinton.

As the two women approached the Johnson home, they saw someone looking outside through a second floor bedroom window. The women knocked on the door, and, as they waited for someone to open it, they saw through a window a man walking down the stairs. The women saw this man turn off the lights inside the house and duck down as if to avoid being seen. The two women walked to a back door and knocked on it. The women heard sounds of a struggle, described as 'a commotion,' 'tussling' and 'fighting,' coming from inside the house. Then Ms. Johnson began to scream, and a window on the second floor broke over the women's heads.

The two women fled to the home of a relative who lived nearby and called the police. On the way to the relative's house, Ms. Wilson noticed a car parked across the street from her mother's house. The car resembled one that Appellant sometimes borrowed from his former girlfriend and mother of his child, Debra Meyers. Upon returning to the Johnson home, Ms. Wilson was informed by the police that her mother was dead.

There were no signs of forced entry into the Johnson home. · Wanda Johnson's body was found in the master bedroom. She had been shot three times in the head, once in the back, and once in the arm. It was Ms. Johnson's custom to keep a small amount of money in her wallet. Furthermore, when Ms. Wilson spoke to Ms. Johnson earlier that evening, at approximately 9:00 p.m., Ms. Johnson said that she had twenty dollars. Ms. Johnson's open wallet was found atop her dresser in the master bedroom; there was no money in the wallet.

In the den, a door to a closet had been forced open, revealing a safe. The closet door had a hasp and a lock on it for security, but the hasp and lock had been pried out of the door jamb to gain access to the closet. Pulling the hasp out of the door jamb had caused splinters to fall on the floor around the closet. The safe inside the closet was closed. Mr. Johnson opened the safe the day after his wife's murder; it contained fifteen dollars. ·

· The next day, Ms. Clinton worked with a police artist on a · sketch of the man she had seen on the staircase inside the Johnson home the evening before. Ms. Wilson was asked to look at the sketch that had been made based on Ms. Clinton's description. Appellant, who had come to the police station to keep Ms. Wilson company, took the sketch away before Ms. Wilson had a chance to see it, telling the police that the sketch would upset her. When Ms. Wilson finally had a chance to see the police sketch, she did not immediately identify Lawrence Bradshaw as the man depicted in the sketch. She made a photo identification of another man, who was arrested and incarcerated for a brief time as a result. Ms. Wilson later agreed, however, that the police sketch looked like Lawrence Bradshaw.

Shortly after 1:00 a.m. on October 23, 1994, approximately 27 hours after the murder of Ms. Johnson, Lawrence Bradshaw was shot in the 4300 block of McDowell Lane. This street is located in the Lansdowne area, near Debra Meyers's home. Mr. Bradshaw had been shot three times in the head, once in the back, once in the arm, and once in the

finger. Mr. Bradshaw was taken to Shock Trauma, where he died the following day."

*Conyers I,* 345 Md. at 534–36, 693 A.2d at 785–86.

As to Johnson, Appellant was convicted of premeditated murder, felony murder, first-degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, robbery, attempted robbery, and use of a handgun in the commission of a crime of violence, and sentenced to death. With respect to Bradshaw, Appellant was found guilty of premeditated murder and use of a handgun in the commission of a crime of violence, and sentenced to life without parole.

On appeal, this Court found the evidence was insufficient to sustain Appellant's conviction for the burglary of Johnson's home, but sustained the remaining convictions. Regarding sentencing, we held that certain portions of Appellant's juvenile record that were contained in the pre-sentence investigation (PSI) report should not have been presented to the jury because the material was considered "inflammatory and highly prejudicial." *Conyers I,* 345 Md. at 563, 693 A.2d at 799. Consequently, Appellant was granted a new sentencing hearing.

At the second capital sentencing hearing, during the State's case, Charles Johnson (no relation to the victim, Wanda Johnson, or her husband) testified that while he was Appellant's cellmate at the Baltimore County Detention Center in October–November of 1994, Appellant discussed the robbery at Johnson's home. Charles Johnson stated Appellant told him that he and a person named "Molek" went to Wanda Johnson's house and Appellant went upstairs to rob a safe. Charles Johnson testified:

> "During the robbery someone came to the door. At that point, Ms. Johnson yelled out ... her daughter's name or something of that nature. And Clarence panicked because, I guess, they would recognize him is what he said, and as a result he wound up shooting Ms. Johnson."

Charles Johnson went on to state that Appellant told him that while both he and "Molek" were upstairs at first, when

they heard noise "Molek" ran downstairs. After Johnson was shot, "Molek" ran but Appellant waited until no one was outside before he left.

Wanda Johnson's husband, Elwood Johnson, testified that Appellant was a frequent visitor to their home. He also described the layout of the home, providing specific details about a spare bedroom that contained a safe in a closet. The safe, which contained personal papers and petty cash, had a combination lock and the closet was secured with a lock and hasp. Mr. Johnson stated that earlier in the day, the safe and closet were in normal condition but when he returned after the shooting the closet had been forced open and the hasp was broken. Furthermore, his wife's wallet was lying open on a dresser in their bedroom, which normally would have been inside her purse and placed in a cabinet or dresser drawer.

Wilson, the victim's daughter, basically recapped her trial testimony, describing her past relationship with Appellant, her arrival at her mother's home with her cousin and son, hearing noise and her mother's screams, fleeing the scene and going for help down the street, and finally being informed of her mother's murder. Wilson also testified to Appellant's efforts to prevent her from seeing the composite sketch of Bradshaw that her cousin helped develop and to keep her from reading or viewing any news related to the murder. Wilson stated Appellant knew about the safe in her parent's spare bedroom and that he was aware her mother was not normally home on Friday evenings. Wilson knew that Appellant owned a .38 caliber pistol, the type of weapon used to kill her mother.

Carla Clinton, Wilson's cousin who was with her at the crime scene, also repeated her trial testimony as to going to the Johnson house, seeing someone downstairs, hearing noise and her aunt's screams from inside the house, and finally assisting the police in the development of a composite sketch of the person she saw in the house.

Also during the State's case, a stipulation was presented to the jury regarding the recovered cartridges and the fact that they were all fired from a .38 caliber handgun. In addition,

Victoria Gibson, the victim's sister, testified as a victim impact witness, describing her sister's nature and personality and the warm relationship she had with her entire family. Furthermore, Appellant's PSI report, which was redacted to the satisfaction of both the State and defense, was introduced into evidence.

During the defense's case, Arthur Rogers testified that he was incarcerated with Charles Johnson during October 1994 and at one point he discovered Johnson "rifling through my charging documents." Ventura McLee testified that he was incarcerated in October 1994 with Appellant and Charles Johnson. During this period, Charles Johnson showed McLee indictment papers, police reports, and photographs relating to Appellant's case. Timothy Wren testified that while he was incarcerated with Charles Johnson during August and October 1994, Charles Johnson told him that he had seen Appellant's charge papers, that he had heard Appellant talk about the case in his sleep, and that Appellant had confessed his guilt. Eric Spencer, who resided in the cell next to Charles Johnson and Appellant in October 1994, testified that he never heard Appellant discussing his case with Charles Johnson.

Testifying as mitigation witnesses were Appellant's parents, Clarence Conyers, Sr., and Eleanor Conyers, as well as Reverend William Felder. Appellant exercised his right of allocution, stating that he "had no involvement in this crime whatsoever."

Additional facts will be provided as necessary as they relate to the respective issues that follow.

## II. ANALYSIS

### A. Preservation of Issues for Appellate Review

As a threshold matter, before we specifically address each of the issues Appellant has asked us to review, we must discuss in general terms the requirements for preserving an issue for appeal. Of the twelve issues Appellant raises for appeal, eight of them were not properly preserved for review

by this Court. The particular reasons why Appellant's issues are not properly preserved for appeal will be discussed in detail in part II., subsections B., D., E., G., H., I., K., and L., *infra*.

The scope of this Court's review is delineated in Maryland Rule 8–131, with (a) stating in part: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court...." *See also Walker v. State,* 338 Md. 253, 262, 658 A.2d 239, 243 (1995)(stating that "[w]e ordinarily will not review an issue that was not presented to the trial court"); *State v. Bell,* 334 Md. 178, 187, 638 A.2d 107, 112 (1994)(declaring "that an appellate court will not ordinarily consider an issue that has not previously been raised")(quoting *Robeson v. State,* 285 Md. 498, 501, 403 A.2d 1221, 1223 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980)); *State v. Hutchinson,* 287 Md. 198, 202, 411 A.2d 1035, 1037 (1980)(observing that "[o]rdinarily appellate courts will not address claims of error which have not been raised and decided in the trial court"); *Gaylord v. State,* 2 Md.App. 571, 575, 235 A.2d 783, 786 (1967)(holding that "the court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court"). While the remainder of Md. Rule 8–131(a) provides the reviewing court with the authority to decide issues not raised below, such power is solely within the court's discretion and is in no way mandatory. *Bell,* 334 Md. at 187–88, 638 A.2d at 113. In *Bell,* we stated:

> "It is clear from the plain language of Rule 8–131(a) that an appellate court's review of arguments not raised at the trial level is discretionary, not mandatory. The use of the word 'ordinarily' clearly contemplates both those circumstances in which an appellate court will not review issues if they were not previously raised and those circumstances in which it will."

*Bell,* 334 Md. at 188, 638 A.2d at 113.

We have repeatedly asserted that the main purpose of Md. Rule 8–131(a) is to make sure that all parties in a case are

accorded fair treatment, and also to encourage the orderly administration of the law. *Bell,* 334 Md. at 189, 638 A.2d at 113. Toward that end, we stated in *Bell:* "The interests of fairness are furthered by 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.'" *Id.* (quoting *Clayman v. Prince George's Co.,* 266 Md. 409, 416, 292 A.2d 689, 693 (1972)).

▇ Another rule pertinent to our discussion is Md. Rule 4–323, which describes the method for making objections in criminal proceedings. Maryland Rule 4–323 applies to both trial and sentencing proceedings. *See Towers v. Director,* 16 Md.App. 678, 682, 299 A.2d 461, 464–65 (1973)(stating that "the rule is as equally applicable to the penalty stage of the trial as to the guilt stage"). Maryland Rule 4–323(a), "Objections to evidence," states: "An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Similarly, Md. Rule 4–323(c), "Objections to other rulings or orders," provides:

"For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court."

Support for the principles expounded in Md. Rule 4–323 can be found in *Leuschner v. State,* 41 Md.App. 423, 436, 397 A.2d 622, 630 (1979)(holding that "[i]t is axiomatic that to preserve an issue for appeal some objection must be made or a party will be deemed to have waived an objection"); *Gaylord,* 2 Md.App. at 575, 235 A.2d at 786 (declaring that "a defendant in a criminal prosecution cannot raise for the first time on appeal an objection which was available to him at the trial and which he did not raise below"); *Caviness v. State,* 244 Md. 575, 578, 224 A.2d 417, 418 (1966)(observing that "unless a defendant makes timely objections in the lower court or makes

his feelings known to that court, he will be considered to have waived them and he can not now raise such objections on appeal"); *Davis v. State,* 189 Md. 269, 273, 55 A.2d 702, 704 (1947)("[S]ome objection [must] be made and ... the court [must] rule upon the question. In the absence of such a ruling there is nothing for the Court of Appeals to review.").

■ In the instant case, Appellant maintains that we should relax the preservation requirement because earlier capital cases indicated such action is appropriate. While some of our previous death penalty cases may have suggested that we will be less strict about the failure to properly preserve issues for review (*see Jones v. State,* 310 Md. 569, 580 n. 2, 530 A.2d 743, 748 n. 2 (1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988); *Foster, Evans, and Huffington v. State,* 305 Md. 306, 316, 503 A.2d 1326, 1331, *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Johnson v. State,* 292 Md. 405, 412 n. 3, 439 A.2d 542, 547 n. 3 (1982)), we reiterate our statement in *Bruce v. State,* 328 Md. 594, 611, 616 A.2d 392, 400 (1992) that "despite the special character of a capital case, the tried and tested rules of evidence and procedure still apply. Both sides should play by the rules." Jury instructions present a similar issue, but are controlled by Md. Rule 4–325(e). That rule permits an appellate court to take cognizance of "any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

■ While an appellate court has some discretion to address and decide unpreserved issues, ordinarily this discretion will not be exercised. The rules for preservation of issues have a salutary purpose of preventing unfairness and requiring that all issues be raised in and decided by the trial court, and these rules must be followed in all cases including capital cases. The few cases where we have exercised our discretion to review unpreserved issues are cases where prejudicial error was found and the failure to preserve the issue was not a matter of trial tactics. We have generally done so by either addressing and deciding the issue as part of our holding, as an

alternative holding, or by way of dicta. We usually elect to review an unpreserved issue only after it has been thoroughly briefed and argued, and where a decision would (1) help correct a recurring error, (2) provide guidance when there is likely to be a new trial, or (3) offer assistance if there is a subsequent collateral attack on the conviction. The fact that we have dealt with unpreserved issues in some capital cases, and will do so in the instant case, stems in part from our recognition that future collateral attacks are highly likely in such cases. Our decision to review unpreserved issues in this particular case should not be viewed as an indication that we will review unpreserved issues in future cases.

In essence, we emphasize that where counsel wishes to object to the admission of any evidence, he or she must do so in a timely fashion or the issue will not be preserved for review. Counsel should not rely on this Court, or any reviewing court, to do their thinking for them after the fact. Furthermore, we have stated that even in a death penalty case, with the potential finality of its outcome, litigation cannot continue *ad infinitum* through counsel "withholding issues or framing the questions differently each time." *Foster*, 305 Md. at 316, 503 A.2d at 1331.

As previously stated, eight of the twelve issues Appellant asks us to review were not properly preserved in accordance with the general rules and principles detailed *supra*. Consequently, as there were no objections to these issues raised by defense counsel at the trial level, we are not obligated pursuant to Md. Rules 8–131 and 4–323 to provide any discussion or analysis of them. However, as previously indicated, we will exercise our discretion and briefly discuss all of the issues Appellant raises, including the eight unpreserved ones. With this in mind, we now turn to our analysis of the twelve issues that Appellant asks us to review.

### B. Detective Marll's Testimony About Charles Johnson

The first issue that we shall address is whether Appellant was deprived of a fair hearing because of Detective Philip Marll's testimony regarding prosecution witness Charles

Johnson. As stated in part I., *supra*, Charles Johnson testified for the State about inculpatory statements Appellant made to him while the two were cellmates. During cross-examination, defense counsel attempted to undermine Charles Johnson's credibility by showing he had a plan to reduce his prison time on pending charges by providing the State with information on other inmates' cases. To support this theory, defense counsel asked if he had rifled through Appellant's papers and the case files of other prisoners, but he denied doing so. Arthur Rogers and Ventura McLee testified as defense witnesses, stating that they had seen Charles Johnson looking through either their own case files or displaying to them the case documents of other prisoners. Timothy Wren also testified for the defense, stating that Charles Johnson told him he had seen Appellant's "charge papers."

The State then called Marll, who was one of the investigating officers in the case, as a rebuttal witness. He testified that on November 23, 1994, he was informed that Charles Johnson had contacted his unit and asked to speak with someone about the Wanda Johnson murder. Subsequently, Marll and his partner went to the detention center and brought Charles Johnson back to the police department, where they obtained his written statement. After answering questions regarding his familiarity with the charging document, police report, and affidavit in support of the search warrant, Marll testified as follows:

"[State's Attorney:] Now, what I am going to ask you to do, Detective, is without referring to specifics, have you had the opportunity to compare what information [Charles] Johnson gave you in comparison to the information that was in the charging papers and the affidavit in support of the search warrant?

[Marll:] Yes, sir, I was.

[State's Attorney:] And is there any information within the information that Mr. Johnson gave you that is above and beyond that which was contained within the charging documents and this search warrant which you were able to verify?

[Marll:] Yes, sir. There was a significant number of statements that were made by Mr. Johnson, some factual statements that were made by Mr. Johnson that were not included in the application for statement of charges and/or the affidavit for the search and seizure warrants that myself and my partner obtained. *These statements which I knew upon hearing them from Mr. Johnson to be truthful, and I was able to verify each and every statement that he gave us."* (Emphasis added).

The Appellant contends that the emphasized portion of Marll's testimony was improper and prejudicial because Marll was offering his opinion as to Charles Johnson's credibility as a witness. In support of his contention, Appellant relies primarily on *Bohnert v. State,* in which we stated:

"In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury.... It is ... error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying.

* * *

It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." (Citations omitted).
312 Md. 266, 277–78, 539 A.2d 657, 662–63 (1988).

As a preliminary matter, Appellant's claim of error was not preserved for review. Apparently in the context of Marll's entire testimony, defense counsel did not deem the statements so improper and prejudicial as to require an objection. Therefore, we are not required to review this issue. *See* full discussion in part II., subsection A., *supra.* Even if the issue were properly preserved for appeal, however, Appellant's reliance on *Bohnert* is misplaced. In *Bohnert,* we found revers-

ible error where a social worker's testimony essentially amounted to an assertion that an alleged child abuse victim was telling the truth and that the defendant was lying. In the instant case, it is clear that Marll was not offering an opinion as to Charles Johnson's credibility as a witness. Instead, Marll was stating that certain information Charles Johnson had supplied him with prior to trial was not contained in Appellant's papers and, because he was able to confirm that information, he regarded it as accurate and, therefore, truthful. The purpose of Marll's testimony was twofold: First, to demonstrate that Charles Johnson could only have obtained some of this information from Appellant himself and not from "rifling through" documents found in Appellant's cell; and second, to show that some of Charles Johnson's information was known only to the killer and those investigating the murder, and thus Johnson could only have learned the information from the person who committed the murder. For these reasons, Marll's rebuttal testimony regarding the information Charles Johnson provided the State did not invade the province of the jury, which is charged with determining the credibility of witnesses and the weight to accord their testimony.

Thus, for the reasons stated, we hold that Appellant was not deprived of a fair hearing by Marll's testimony regarding prosecution witness Charles Johnson, and reversal is not warranted.

### C. Direct Examination of Arthur Rogers

The second issue is whether the trial court erroneously restricted the direct examination of defense witness Arthur Rogers. During Rogers' testimony, defense counsel sought to have the following two extrajudicial statements introduced into evidence: (1) Rogers' warning to Appellant that he should not talk to Charles Johnson because Johnson was examining the court documents of other inmates, and Rogers had seen Charles Johnson going through his own papers; and (2) Charles Johnson's statement to Rogers, "you need to take care of number one first," as his reason for engaging in the

conduct of searching other inmates' cells for information about their cases. We begin by emphasizing that while the trial court did sustain the State's objections as to the reasons for Rogers' warning to Appellant, as well as to Charles Johnson's alleged "number one" statement to Rogers, the trial judge did permit Rogers to testify that he warned Appellant not to talk with Charles Johnson about his case. The pertinent testimony is as follows:

"[Defense Counsel:] Mr. Rogers, at the time that Mr. Conyers was moved into the cell with [Charles] Johnson, did you advise Mr. Conyers not to talk with Mr. Johnson? [Rogers:] Yes, I did."

First, the defense wanted the jury to know that Rogers warned Appellant not to speak with Charles Johnson about his case, because Rogers had "found [Charles Johnson] rifling through [his] charging documents." The obvious inference defense counsel wished the jury to make was that as a result of Rogers' warning, Appellant did not tell Charles Johnson anything about his case. The relevant portions of Rogers' testimony on this issue are as follows:

"[Defense Counsel:] Did you have any conversations with Mr. Conyers about [Charles] Johnson?

[Rogers:] Yes.

[Defense Counsel:] And what, if anything, did you tell Mr. Conyers?

[State's Attorney:] Objection.

[The Court:] Sustained.

(Counsel then approached the bench and the following exchange occurred.)

[Defense Counsel:] I assume the basis for the State's objection is that it calls for a hearsay response. The defense's position is that it—the proffer would be that the response would be that he advised Mr. Conyers, the defendant, not to talk to Clarence—to Charles Johnson because Johnson was rifling through people's papers to look for some case to get involved in. And not to prove that that's— to prove the truth of the matter of the statement that Mr.

Rogers would make but to prove that Johnson, in fact, or to prove Conyers was unlikely to have told Johnson anything based on that advice. That is the basis for the offer of that evidence.

[State's Attorney:] It still sounds like hearsay to me, Your Honor.

[The Court:] Well, technically, it wouldn't be hearsay if it is offered to prove what somebody did in response to the information received, but don't you have to have evidence as to what he did in response to that information?

[Defense Counsel:] I think the inference can be drawn that if he was put on notice, [Charles] Johnson says that he told him all these details. We are challenging about whether that is the case. Apparently in this case, that's the gravamen of the issue.

[The Court:] *I will permit you to ask the leading question 'did you advise him not to talk ...'—but as to his conclusions—*

[Defense Counsel:] Okay." (Emphasis added.)

Second, the defense wanted to establish that Charles Johnson had described his motivation for examining documents of other inmates' cases as "taking care of number one first," a motivation consistent with lying on the witness stand and not with truth-telling and justice. The pertinent section of Rogers' testimony on this matter is as follows:

"[Defense Counsel:] Did [Charles] Johnson make any statements to you regarding what he intended to do with information about Mr. Conyers' case?

[State's Attorney:] Objection.

[The Court:] Sustained.

(Counsel then approached the bench and the following exchange occurred.)

[Defense Counsel:] Again, Your Honor, the proffer would be not to prove the contents of the comment that [Charles] Johnson made to Mr. Rogers but to prove *Mr. Johnson's state of mind at the time and his motive in looking through*

*people's papers, and the proffer of the testimony of this witness would be that this witness would say that Mr. Johnson said to him something to the effect that 'you need to take care of number one first,' something to the effect that—*

[The Court:] Aren't you offering it to prove that [Charles] Johnson was taking caring [sic] of number one first? He was afraid to prove the truth of what was contained in the statement?

[Defense Counsel:] Well, I think we are offering it to prove—it's a dual purpose, I guess, is what I'm saying. We're offering it to prove, and I wouldn't mind an instruction to the jury that would tell the jury that they can't use it to prove the truth of the matter but to use it to prove the state of mind, and I think it is critical to this defense.

[The Court:] Well, if you had asked the question of the witness so that he could have—if he admitted it, that would have been fine. If he denied it, then you would have the opportunity to ask it on the basis of an inconsistent statement, but he was never asked to my knowledge on cross-examination or direct examination concerning any statements he made to this witness.

[Defense Counsel:] I think the Court's correct on that.

[The Court:] I will sustain the objection." (Emphasis added.)

The proffer was that Charles Johnson gave Rogers an explanation of his motive for looking through the papers of other inmates and the explanation was "that he was taking care of number one first." Assuming there was any probative value in a statement by a fellow inmate that he was not altruistic and was looking out for himself first, Rogers' testimony about Charles Johnson's statement would be hearsay. Hearsay is defined in Md. Rule 5–801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted."[2] *See also Ali v. State,* 314 Md. 295, 304, 550 A.2d 925, 929 (1988). An out-of-court statement is admissible if it is not being offered for the truth of the matter asserted or if it falls within one of the recognized exceptions to the hearsay rule. *See* Md. Rules 5–802.1, 5–803, and 5–804. *See* footnote 2. *See also Richardson v. State,* 324 Md. 611, 621, 598 A.2d 180, 185 (1991)(stating that "[i]n ruling on the admissibility of hearsay evidence, the trial judge must examine the nature of the out-of-court statements, as well as what they are offered to prove").

Appellant argues that neither statement could be excluded as hearsay, but we disagree for the following reasons. Regarding Appellant's assertion that the trial judge wrongly excluded Rogers from testifying as to his warning to Appellant that he should not talk to Charles Johnson because. Johnson was examining the records of other inmates, Appellant argues that the statement is classic non-hearsay and cites *Burgess v. State,* 89 Md.App. 522, 537 n. 12, 598 A.2d 830, 838 n. 12 (1991), for the proposition that warnings do not fall within the hearsay rule and are thus admissible. We reiterate that as the record clearly shows, Rogers was permitted to, and did, testify as to warning Appellant not to talk to Charles Johnson. Rogers, however, was not permitted to expand on the underlying reasons he gave for the warning, with the trial judge exercising his discretion to prevent this substantive information from being presented to the jury.

Appellant also asserts that the trial court erred in not allowing Rogers to testify to Charles Johnson's alleged state-

---

**2.** Although the Maryland Rules of Evidence do not strictly apply in capital sentencing proceedings, we still look to the underlying evidentiary principles for guidance. As we stated in *Whittlesey v. State:*
 "[T]he Rules expressly do not apply in capital sentencing proceedings. The committee note to Maryland Rule 5–101 reads ... '[T]he Rules in this Chapter are not intended to limit the Court of Appeals in defining the application of the rules of evidence in sentencing proceedings in capital cases or to override specific statutory provisions regarding the admissibility of evidence in those proceedings.'" (Citation omitted).
340 Md. 30, 71 n. 12, 665 A.2d 223, 243 n. 12 (1995).

ment to him that Johnson "needed to take care of number one first," because the statement falls within the state of mind exception to the hearsay rule.[3] Specifically, Appellant contends that the statement was either offered to show an independently relevant state of mind and was therefore not offered for the truth of the matter asserted, or it was offered to prove Charles Johnson's state of mind. *See* 6 LYNN MCLAIN, MARYLAND EVIDENCE § 801.10, at 282–83, which states: "Statements offered, not to prove the truth of the matters asserted therein, but as circumstantial evidence that the declarant had knowledge of or believed certain facts or had a particular state of mind, when that knowledge, belief, or state of mind is relevant, are nonhearsay." (Citations omitted). *See also Baker v. State,* 332 Md. 542, 558, 632 A.2d 783, 790–91 (1993)(holding that hearsay falling within the state of mind exception is admissible in a capital sentencing proceeding).

The trial judge did not err in concluding that the statement that Charles Johnson "was taking care of number one first" was being offered for the truth of the matter asserted and was thus hearsay. As the transcript excerpt *supra* illustrates, the trial court observed, and defense counsel concurred, that had Johnson been cross-examined while on the witness stand and denied making the statement, the statement would have been admissible as a prior inconsistent statement per Md. Rule 5–613.[4] Having not done so, however, there was

---

3. **Rule 5–803. Hearsay exceptions: Unavailability of declarant not required.**

* * *

"(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

4. **Rule 5–613. Prior statements of witnesses.**

no proper basis for its admissibility and the trial court correctly sustained the State's objection.

■ Even more important, Charles Johnson's alleged statement about his self-interest is not proof that he engaged in any specific action for the purpose of "taking care of number one first." Under the state of mind exception to the hearsay rule, "a statement of the declarant's then existing state of mind is admissible to prove the truth of the matter asserted, except that it is generally inadmissible ... to prove a fact [such as an action] which purportedly happened *before the statement was made.*" 6 LYNN MCLAIN, MARYLAND EVIDENCE § 803(3).1, at 356–57 (emphasis added). In the instant case, we cannot make the inferential leap that because Charles Johnson allegedly said to Rogers that he "was looking out for number one," that he actually did rifle through other inmates' case documents, and in particular Appellant's documents, in order to cut a deal with the State.

■ Even if the trial court erred in excluding either one or both statements, any error was harmless beyond a reasonable doubt. "Every error committed by a trial court is not grounds for a new trial. Reversible error will be found and a new trial warranted *only* if the error was likely to have affected the verdict below.... If [the error] is merely harmless error, [then] the judgment will stand." 5 LYNN MCLAIN, MARYLAND EVIDENCE § 103.22, at 49 (emphasis added). *See*

---

"(a) *Examining witness concerning prior statement.* A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) *Extrinsic evidence of prior inconsistent statement of witness.* Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter."

*also Dorsey v. State,* 276 Md. 638, 647, 350 A.2d 665, 671 (1976)(stating the same proposition). In the instant case, as we stated in part II., subsection B., *supra,* some of the information that Charles Johnson provided regarding the Wanda Johnson murder went beyond anything contained in the papers Appellant had in his cell. Indeed, some of Charles Johnson's information was known only to those investigating the murder, and of course by the person who committed the crime. Obviously, then, Charles Johnson's information could only have been obtained from Appellant himself. Therefore, even if Charles Johnson had access to Appellant's case documents and the trial judge erred in disallowing the jury to hear any defense witness statements to this effect, such error is harmless because the testimony would not have affected the ultimate outcome of the proceeding. Moreover, the examination of witnesses at trial and control over witnesses' testimony are left to the discretion of the trial judge. *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258, 278 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Trimble v. State,* 300 Md. 387, 401, 478 A.2d 1143, 1150 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985).

During the sentencing hearing, and also during the defense's closing statements, the jury was made well aware of the Appellant's theory that Charles Johnson was a jailhouse "snitch" who fabricated his conversations with Appellant regarding the Wanda Johnson murder so that he could reduce his own time spent in prison. We can safely assume that the jury took this theory with them into the jury room for deliberations and considered it and any supporting evidence, along with all the other evidence in the case, before rendering its verdict. Consequently, we hold that any alleged error did not affect the outcome of the sentencing proceedings and was harmless beyond a reasonable doubt. The trial judge also acted properly in sustaining the State's objections to the extrajudicial statements Appellant wished to enter into evidence.

### D. Direct Examination of Ventura McLee and Eric Spencer

The third issue is whether the trial court erroneously restricted the direct examination of defense witnesses Ventura McLee and Eric Spencer. During the direct examination of McLee, defense counsel sought to elicit that Charles Johnson had told McLee what he intended to do with Appellant's indictment papers, which Charles Johnson allegedly displayed to McLee, and that Appellant was warned not to speak with Charles Johnson. During Spencer's direct examination, defense counsel similarly attempted to introduce additional testimony that Appellant was advised not to talk with Charles Johnson about this case. As with Rogers' testimony, discussed in part II., subsection C., *supra*, we begin by noting that while the trial judge did sustain the State's objections as to some testimony regarding McLee's warning to Appellant, he was permitted to testify as to the fact of the warning itself. The pertinent testimony is as follows:

"[Defense Counsel:] Did you ever have a conversation wherein you warned Mr. Conyers about [Charles] Johnson?

[State's Attorney:] Objection.

[The Court:] I will permit him to answer the specific question that I permitted the other witness to [answer], if you will ask it.

[McLee:] Yes."

Spencer, however, was properly not permitted to testify as to any warning statement made to Appellant because his testimony as to this matter was plainly hearsay, as will be discussed *infra*.

The additional relevant portion of McLee's testimony is as follows:

"[Defense Counsel:] Let me ask you this. Did there come an incident where—did you play cards?

[McLee:] Yes. Me, [Charles] Johnson and Clarence Conyers.

[Defense Counsel:] Did there ever come an incident where Mr.—you had a conversation with [Charles] Johnson about Mr. Conyers when Mr. Conyers was not there?

[McLee:] Yes.

[Defense Counsel:] Did [Charles] Johnson display to you any documents during this conversation?

[State's Attorney:] Objection.

[The Court:] Overruled.

[McLee:] Yes.

[Defense Counsel:] Can you identify the documents that [Charles] Johnson displayed to you?

[McLee:] He had his indictment papers.

[The Court:] Whose indictment papers?

[McLee:] [Charles] Johnson had Clarence Conyers' indictment papers.

[Defense Counsel:] Did he have anything else?

[McLee:] Police report and some pictures.

[Defense Counsel:] Did he indicate to you what he planned to do with that information?

[State's Attorney:] Objection.

[The Court:] Sustained.

[Defense Counsel:] Did there come a time when Mr. Conyers was advised [Charles] Johnson had his papers?

[State's Attorney:] Objection.

[The Court:] Sustained.

[Defense Counsel:] Do you know if Mr. Conyers learned about this display?

[State's Attorney:] Objection.

[The Court:] Sustained.

[Defense Counsel:] Did you at any point in time either before or after this incident advise Mr. Conyers about discussing his case with [Charles] Johnson?

[State's Attorney:] Objection.

[The Court:] Overruled.

[McLee:] Yes.

[Defense Counsel:] And what was the substance of that advice?

[State's Attorney:] Objection.

[The Court:] Sustained."

The pertinent section of Spencer's testimony is as follows:

"[Defense Counsel:] Did you meet Mr. Conyers at the detention center?

[Spencer:] Yes.

[Defense Counsel:] *Did there come a time that you are aware of where Mr. Conyers was warned about discussing his case with [Charles] Johnson?*

[State's Attorney:] Objection.

[The Court:] Sustained." (Emphasis added.)

As in his preceding argument, part II., subsection C., *supra,* Appellant maintains that both McLee and Spencer should have been permitted to testify to Charles Johnson's planned use of Appellant's case documents, as well as to specific details of warnings Appellant was given about Charles Johnson and his motives. The basis for Appellant's argument is that the "planned use of the papers" statement falls within the state of mind exception to the hearsay rule and the "warning" statements are nonhearsay. As an initial matter, Appellant never established what was excluded. When the court sustained objections, defense counsel never proffered what the answers would be to the questions. Although Appellant argues that the answers to these questions were obvious, it is not obvious to us. A proffer as to the substance and importance of the expected answers was required in order to preserve the issue for appeal. *See Bruce,* 328 Md. at 627, 616 A.2d at 408 (stating that "[a] party must clearly proffer his theory to the trial court in order to challenge on appeal the sustaining of objections to those questions"); *Mack v. State,* 300 Md. 583, 603, 479 A.2d 1344, 1354 (1984)(holding that "the question of whether the exclusion of evidence is erroneous and constitutes prejudicial error is not properly preserved for appellate review unless there has been a formal proffer of what the contents and relevance of the excluded testimony

would have been"). Thus, because this issue was not pre-served for appeal we are not required to review it. *See also* full discussion in part II., subsection A., *supra.*

 Assuming *arguendo* that the issue was properly pre-served for appeal, the trial judge's exclusion of this evidence was not erroneous and did not deprive Appellant of a fair hearing. Earlier in his testimony, the trial court permitted McLee to testify that he had warned Appellant not to discuss his case with Charles Johnson. As with Rogers, however, McLee was not permitted to testify as to the substance and particulars of this warning. McLee also was not allowed to testify as to what Charles Johnson was going to do with Appellant's case information, or as to whether Appellant ever discovered that Charles Johnson had his documents. The trial court did not err in refusing to allow the jury to hear McLee's testimony on these matters. In trying to present these state-ments to the jury, defense counsel was attempting to elicit evidence as to Charles Johnson's words and actions, not to his state of mind, which clearly was being offered to prove the truth of the matter asserted; that is, Charles Johnson was looking out for himself and trying to arrange a deal with the State, which gave him a motive to fabricate information re-garding Appellant's case. For a discussion on the hearsay rule and the state of mind exception, *see* part II., subsection C., *supra.*

As to Spencer's testimony, defense counsel was seeking to demonstrate that Spencer knew someone else had warned Appellant about Charles Johnson. Unlike Rogers and McLee, who were permitted to testify that they had warned Appellant themselves not to talk to Charles Johnson, Spencer had no firsthand knowledge of Charles Johnson's alleged motives that resulted in his having a direct conversation with Appellant in which he warned him not to share information with Charles Johnson. Thus, Spencer had no firsthand, personal informa-tion to convey to the jury. His testimony that he knew someone else had warned Appellant not to speak with Charles Johnson about his case is plainly hearsay, for the same

reasons we found McLee's testimony to be hearsay, as discussed *supra.*

Even if the trial court erred in excluding these two defense witnesses' statements, we hold that any error was harmless beyond a reasonable doubt because their testimony would not have affected the ultimate outcome of the proceeding. In the instant case, as we stated in part II., subsection B., *supra,* some of the information that Charles Johnson provided regarding the Wanda Johnson murder went beyond anything contained in the papers Appellant had in his cell. Indeed, some of Charles Johnson's information was known only to those investigating the murder, and of course by the person who committed the crime. Obviously, then, Charles Johnson's information could only have been obtained from Appellant himself. As with Rogers' testimony, the jury could not help but be clear on the point defense counsel was trying to convey: that Charles Johnson was a jailhouse "snitch" who was not to be trusted and that Appellant was warned about him and thus did not tell him anything about his involvement in the Wanda Johnson murder. *See* part II., subsection C., *supra.*

### E. Mitigating Circumstance of Sympathy or Mercy

The fourth issue is whether the trial court erroneously instructed the jury that a mitigating circumstance of sympathy or mercy must be based on evidence. During the Appellant's resentencing hearing, the trial court instructed the jury as to non-statutory mitigating factors: "Any factor causing you to feel sympathy or mercy toward the defendant may be considered by you as a mitigating circumstance so long as such factor is raised by the evidence." Appellant argues that this jury instruction was an incorrect statement of law because it informed the jurors that they could not consider circumstances giving rise to a feeling of sympathy or mercy unless such circumstances were raised by actual evidence.

Appellant's claim of error regarding the trial court's instruction on mitigating circumstances was not pre-

served for review. At no point during the proceeding did defense counsel object to the instruction on mitigating circumstances or to the wording on the verdict sheet, which includes the phrase "based upon the evidence" throughout.[5] *See* Md. Rule 4–325(e) and 8–131(a). *See also* part II., subsection A., *supra.* Regardless, when the jury instructions are considered as a whole, Appellant's claim has no merit. The jury was instructed that it may consider all evidence and sentencing factors relevant to the defendant's character and background and the circumstances of his crime, despite the fact that the

---

**5.** Although Appellant does not challenge the form required by Md. Rule 4–343(g), in which the capital sentencing findings and determinations must be made, we note that this form also indicates that mitigating circumstances must be based on the "evidence." For example, Section IV begins "Based upon the evidence, we make the following determinations as to mitigating circumstances." In addition, all mitigating circumstances must be found by a "preponderance of the evidence." In the instant case, the trial judge made it clear that "evidence" means more than just the testimony and the physical exhibits. Perhaps the Rules Committee should consider whether a broader phrase such as "facts or circumstances" might be more appropriate in certain sections of the capital sentencing form than the term "evidence."

The United States Supreme Court has also recognized that mitigating factors must be based on "evidence," albeit broadly interpreting the term. In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Court held that Eddings' abusive upbringing and emotional disturbance could be considered as a mitigating circumstance in a capital sentencing proceeding. The Court stated: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating *evidence.*" 455 U.S. at 113–14, 102 S.Ct. at 876–77, 71 L.Ed.2d at 10–11 (emphasis in original and added). *See also Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973, 990 (1978), in which the Court held:
"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Footnote omitted)(emphasis in original).
Finally, we note that it is highly unlikely that a juror would read a narrow definition into the term "evidence" unless specifically instructed to do so. On the contrary, if a jury is given a broad instruction as to what it should consider, it is more likely that the jury would conclude that "evidence" consisted of all that they had seen and heard during the

evidence may extend beyond the statutory aggravating circumstances and the statutory and non-statutory mitigating circumstances. *See Bruce,* 328 Md. at 619–21, 616 A.2d at 405; *Booth v. State,* 327 Md. 142, 195–96, 608 A.2d 162, 188, *cert. denied,* 506 U.S. 988, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992). Indeed, the "catchall" provision in the statutory sentencing scheme of § 413(g)(8) provides that the sentencing body shall consider "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." While the jury has great leeway in considering all relevant evidence and sentencing factors in rendering its verdict, it is appropriate to focus and direct the jury's consideration of mitigating evidence, particularly in capital sentencing cases "in an effort to achieve a more rational and equitable administration of the death penalty." *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155, 170 (1988). The Supreme Court also held in *Franklin* that:

> "Given the awesome power that a sentencing jury must exercise in a capital case, *it may be advisable for a State to provide the jury with some framework for discharging these responsibilities.* And we have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." (Emphasis added).

487 U.S. at 179, 108 S.Ct. at 2330, 101 L.Ed.2d at 169.

It is important, and we strongly admonish judges, to explain to the jury that a § 413(g)(8) mitigating factor is " 'anything relating to the defendant or the crime which causes it to believe that death may not be appropriate' " and to make clear that, in considering mitigating factors, the word "evidence" as used in the sentencing form has a far broader meaning than just testimony and exhibits. *Mills v. State,* 310 Md. 33, 51, 527 A.2d 3, 11–12 (1987), *vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)(quoting *Foster v. State,* 304 Md. 439, 475, 499 A.2d 1236, 1254 (1985), *cert.*

---

proceeding, along with their opinions and impressions, rather than only the factual testimony and exhibits.

*denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986)).
*See also Harris v. State,* 312 Md. 225, 253, 539 A.2d 637, 642
(1988). However, while the trial court directing the jury in
this manner is appropriate, we have declined to adopt hard
and fast rules as to how the mitigation issue is dealt with in
jury instructions. As this Court stated in *State v. Calhoun,*
306 Md. 692, 741, 511 A.2d 461, 486 (1986), *cert. denied,* 480
U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987)(quoting *Peek v.
Kemp,* 784 F.2d 1479, 1494 (11 [th] Cir.1986)):

> "What we reject is the notion that the Constitution requires
> that the jury instructions include any particular words or
> phrases to define the concept of mitigation or the function of
> mitigating circumstances. It is sufficient from a constitu-
> tional standpoint if it is clear from the entire charge consid-
> ered in context that a reasonable jury could not have
> misunderstood the meaning and function of mitigating cir-
> cumstances."

In the instant case, the trial judge began his instructions to
the jury with the following general comments:

> "It is your duty and your function to determine what the
> facts are, to determine the facts from the evidence that was
> presented here at the trial, apply the facts as you have
> found them to the law as I instruct you, and in that way,
> determine your sentence.

> * * *

> You must consider and decide this case fairly and impartial-
> ly. You are to perform this duty without bias or prejudice
> as to any party. You should not be swayed by sympathy,
> prejudice or public opinion.

> * * *

> In making your decision, you must consider the evidence in
> this case. That is, the testimony from the witness stand,
> the physical evidence or exhibits that were admitted into
> evidence, the stipulations and the defendant's allocution."

The trial court went on to instruct the jury as to the specifics of completing the verdict sheet, reviewing it section by section. Regarding Section III, which deals with mitigating circumstances, the trial judge stated as follows:

"In Section III, each of you must determine for yourself whether any mitigating circumstance exists in this case.

For the purpose of this sentencing proceeding, a mitigating circumstance is anything about the defendant or about the facts of this case that in fairness or in mercy may make the death sentence an inappropriate penalty for this defendant.

\* \* \*

As you can see on the forms, the findings recorded in Section III need not be unanimous. Before recording your findings, however, you must deliberate on every issue for a reasonable period of time.

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In determining whether any mitigating circumstance exists, consider all the evidence presented regardless of who introduced it.

A mitigating circumstance must be proven, but need not be proven beyond a reasonable doubt. A mitigating circumstance need only be proven by a preponderance of the evidence. To prove by a preponderance of the evidence means to prove that something is more likely so than not so.

As you will note in the form, in determining whether mitigating circumstances exist by a preponderance of the evidence, you must consider the mitigating circumstances that are referred to on the form."

The trial court then outlined each of these circumstances for the jury. As to the last circumstance, the court stated:

"Under 8, here you would list any additional mitigating circumstance which you find to exist from the evidence.

Any such mitigating circumstances listed here would constitute what is called a non-statutory mitigating factor.

Your determination as to the existence of any such mitigating factor must include the finding that the circumstance exists in this case and that the circumstance is, in fact, mitigating.

In considering non-statutory mitigating factors, you may consider evidence relating to the evidence background as well as relevant and material conduct of the defendant up to and including this sentencing proceeding."

The trial judge then discussed the unanimity issue regarding mitigating circumstances, and concluded by stating:

*"Any factor causing you to feel sympathy or mercy toward the defendant may be considered by you as a mitigating circumstance so long as such factor is raised by the evidence.*

Mercy in and of itself may be considered as a mitigating circumstance.

Record in 8A every such mitigating circumstance that all of you find has been proven. Record in 8B every mitigating circumstance that at least one but not all of you find has been proven." (Emphasis added).

Despite defense counsel's failure to object to the jury instructions or the verdict sheet wording, which as we have already stated does not properly preserve the issue for appeal, Appellant asserts that we should exercise our discretion to apply the plain error doctrine to his unpreserved claim. In general, we will not invoke this discretion except in situations that are "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Hutchinson,* 287 Md. at 203, 411 A.2d at 1038. Moreover, in the context of erroneous jury instructions, the plain error doctrine has been used sparingly. "Maryland cases abound with instances where the plain error doctrine was advanced for a failure to instruct and where this Court subsequently denied review." *Hall v. State,* 292 Md. 683, 691 n. 3, 441 A.2d 708, 712 n. 3 (1982).[6]

---

**6.** In the following cases, Maryland appellate courts declined to apply the plain error doctrine to erroneous jury instructions: *Walker v. State,*

We do, however, note that Appellant is focusing on a

343 Md. 629, 684 A.2d 429 (1996); *Ayers v. State*, 335 Md. 602, 645 A.2d 22 (1994); *State v. Daughton*, 321 Md. 206, 582 A.2d 521 (1990)(reversing Court of Special Appeals' application of the plain error doctrine to the trial court's jury instructions); *Hall v. State*, 292 Md. 683, 441 A.2d 708 (1982); *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980); *Dimery v. State*, 274 Md. 661, 338 A.2d 56 (1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 84 (1976); *Giles v. State*, 229 Md. 370, 183 A.2d 359 (1962); *Cirincione v. State*, 119 Md.App. 471, 705 A.2d 96 (1998); *Fischer v. State*, 117 Md.App. 443, 700 A.2d 829 (1997); *Stockton v. State*, 107 Md.App. 395, 668 A.2d 936 (1995); *Graves v. State*, 94 Md.App. 649, 619 A.2d 123 (1993); *Cicoria v. State*, 89 Md.App. 403, 598 A.2d 771 (1991); *Collins v. State*, 89 Md.App. 273, 598 A.2d 8 (1991); *Hubbard v. State*, 76 Md.App. 228, 544 A.2d 346 (1988); *Laster v. State*, 70 Md.App. 592, 521 A.2d 1289 (1987); *Simms v. State*, 52 Md.App. 448, 449 A.2d 1196 (1982); *Prokopis v. State*, 49 Md.App. 531, 433 A.2d 1191 (1981); *Middleton v. State*, 49 Md.App. 286, 431 A.2d 734 (1981); *Coleman v. State*, 49 Md.App. 210, 431 A.2d 696 (1981); *Stanley v. State*, 43 Md.App. 651, 406 A.2d 693 (1979); *Chaney v. State*, 42 Md.App. 563, 402 A.2d 86 (1979); *Sine v. State*, 40 Md.App. 628, 394 A.2d 1206 (1978); *Cranford v. State*, 36 Md.App. 393, 373 A.2d 984 (1977); *Williams v. State*, 34 Md.App. 206, 366 A.2d 399 (1976); *Wright v. State*, 33 Md.App. 68, 363 A.2d 520 (1976); *Boone v. State*, 33 Md.App. 1, 363 A.2d 550 (1976).

*But see* the following cases involving the extraordinary circumstances necessary before an appellate court will review a trial court's erroneous instructions under the plain error rule: *Richmond v. State*, 330 Md. 223, 237, 623 A.2d 630, 636 (1993)(failure to instruct jury that prosecution was required to prove specific intent plain error; concluding that "with reasonable certainty ... the error in the instruction resulted in a guilty verdict that otherwise would not have been rendered"); *Franklin v. State*, 319 Md. 116, 571 A.2d 1208 (1990)(plain error in jury instruction that specific intent to kill was not required to establish crime of assault with intent to murder); *State v. Hutchinson*, 287 Md. 198, 205, 411 A.2d 1035, 1039 (1980)(jury not instructed that it could find defendant not guilty; stating that "the appellate courts of this State have often recognized error in the trial judge's instructions, even when there has been no objection, if the error was likely to unduly influence the jury and thereby deprive the defendant of a fair trial"); *Brooks v. State*, 68 Md.App. 604, 515 A.2d 225 (1986)(jury instruction allowing mens rea of reckless or wanton disregard to support conviction for malicious destruction of property plainly erroneous); *Fowler v. State*, 7 Md.App. 264, 254 A.2d 715 (1969)(error in instructing jury that it could use past criminal record in determining defendant's guilt). *See also Squire v. State*, 280 Md. 132, 368 A.2d 1019 (1977)(change in constitutional law due to U.S. Supreme Court decision in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), required utilization of plain error doctrine to constitutionally deficient instruction); *State v. Evans*, 278 Md. 197, 362 A.2d 629 (1976)(same); *Stambaugh v. State*, 30 Md.App. 707, 353 A.2d 638 (1976)(same).

single line in the jury instructions (*see* emphasized text of transcript excerpt, *supra* ), rather than looking at the instructions as a whole. As we stated in *State v. Foster,* 263 Md. 388, 397, 283 A.2d 411, 415 (1971), *cert. denied,* 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972): "[A]ttention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *See also Bruce,* 328 Md. at 614, 616 A.2d at 402; *Collins v. State,* 318 Md. 269, 283, 568 A.2d 1, 8 (1990), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990); *Poole v. State,* 295 Md. 167, 186, 453 A.2d 1218, 1228 (1983). In this case, a reading of the instructions in their entirety demonstrates that the trial court did not commit plain error material to the rights of the accused in providing guidance to the jury regarding the non-statutory mitigating factors. *See also Bruce,* 328 Md. at 611, 616 A.2d at 400 (stating that "the five jury instruction errors from which Bruce now appeals do not rise to the level of plain error for perhaps the most basic of all reasons—they were not error at all"). When viewed as a whole, these instructions correctly informed the jury that in determining whether there were any mitigating factors, it could consider anything presented to them during the sentencing proceeding, including "relevant and material conduct of the defendant up to and including this sentencing proceeding." The thoroughness of the trial judge's instructions effectively precluded a juror from not considering a factor he or she perceived as mitigating because it was not "raised by the evidence." Thus, we hold that there is no need for us to "determine whether there exists a 'plain' error so egregious as to warrant reversal absent preservation of [Appellant's] right to appeal the issue under Rule 4–325(e)." *Baker,* 332 Md. at 563, 632 A.2d at 793.

### F. Grossman Testimony and Instruction

The fifth issue is whether the trial court erroneously refused to admit the proffered testimony of Professor Steven Grossman and erroneously refused to propound the requested jury instruction regarding his testimony. Prior to the new

sentencing hearing, Appellant filed a motion *in limine* seeking the admission of Grossman's testimony, proffering that he would testify as to the philosophy underlying the task of sentencing criminal defendants. Before the jury was selected, the trial court considered several motions *in limine,* including the motion concerning Grossman. Regarding this motion, defense counsel stated:

"Your Honor, I am inclined to virtually submit on what has been written. The scope of the testimony that I would profess would be that Mr. Grossman is a Professor of law who routinely teaches and lectures in the area of criminal sentencing, including appearances before the Judicial Conference of the State for District Court and Circuit Court judges. That he would not be called to express any opinions about whether imposing the death penalty in this case would be appropriate or not or what the appropriate sentence would be, but merely ... to give some information to the jury about the traditional parameters and goals of sentencing in criminal cases. It's our position that the jury is likely to have never been asked or called upon to do anything like this before."

The trial court denied the motion, ruling:

"The proffered evidence as I understand it is not in any way defendant-specific. It's ... crime-specific. It does not go to aggravating factors. It does not go to mitigating factors. I do not believe it is relevant to any of the issues for the jury to decide, and I don't believe it would assist the jury in any way in deciding the issues which they have to decide in this case, so the court will order that the proffered testimony be not admitted."

Later during the hearing defense counsel renewed the request, and it was again denied. Still later, when the trial judge was instructing the jury, defense counsel excepted to the court's decision not to give a requested instruction as to Grossman's testimony.[7]

---

7. Defense counsel did not articulate the instruction at the time of taking exception; however, the instruction reads as follows: "The Court

First, Appellant argues that the trial court erred in excluding Grossman's testimony because, if believed, it may have given one or more jurors a reason to impose a sentence less than death. Appellant relies on a case from this Court for the premise that he was deprived of mitigation evidence related to the practical effects of a life sentence as an alternative to a death sentence. *See Doering v. State*, 313 Md. 384, 411, 545 A.2d 1281, 1295 (1988)(holding that "we now conclude that a jury seeking to determine the appropriateness of a life sentence will be aided by information correctly describing the legal and practical effects of such a sentence"). Appellant's reliance on *Doering* is misplaced, however, because John Peterson, Case Management Manager of the Eastern Correctional Institution, and Patricia Cushwa, the Chair of the Maryland Parole Commission, testified during the sentencing hearing as to the specifics of a life sentence and about the daily existence of an inmate incarcerated for life.

 As we stated in part II., subsection E., *supra*, the sentencing body in a capital case may consider any relevant and mitigating evidence and circumstances. *See Bruce*, 328 Md. at 620–21, 616 A.2d at 405. Section 413(c)(1) defines what is admissible at a capital sentencing hearing, to include evidence related to aggravating and mitigating circumstances, prior criminal convictions, and a PSI. Furthermore, § 413(c)(1)(v) states that "[a]ny other evidence that the court deems of probative value and *relevant to sentence*, provided the defendant is accorded a fair opportunity to rebut any statements" is admissible. (Emphasis added). As we maintained in *Conyers I*, "any evidence a trial court wishes to admit ... *must be relevant to sentence and reliable under subsection (v)*." 345 Md. at 566, 693 A.2d at 800 (emphasis added).

---

instructs you that the traditional and appropriate goals in sentencing criminal defendants are: retribution (that is, punishment); public safety; deterrence[;] and rehabilitation. These are the primary ideas you should consider as you decide what sentence to impose."

Of critical importance, then, is that any proffered evidence must be relevant. Maryland Rule 5–401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* footnote 2. The trial court determines whether evidence is relevant or not, and its ruling may not be disturbed on appeal unless there has been an abuse of that discretion. *White v. State*, 324 Md. 626, 636–37, 598 A.2d 187, 192 (1991). *See also Ebb v. State*, 341 Md. 578, 587, 671 A.2d 974, 978 (1996)(declaring that "[t]rial judges have considerable discretion in determining what evidence is relevant and material"). Finally, "[e]vidence which is either irrelevant, or is relevant to an immaterial issue, is inadmissible." 5 LYNN McLAIN, MARYLAND EVIDENCE § 401.1, at 261 (footnote omitted).

In the instant case, the proffered testimony of Grossman was irrelevant to Appellant's character and background or the circumstances of the crime. Thus, it was of no particular aid to the jury. In maintaining that Grossman's testimony was relevant and should therefore have been admitted, Appellant again relies on *Doering, supra.* We point out, however, that our holding in *Doering* referred to "relevant and competent" information, which is anything related to the defendant or the crime. 313 Md. at 412, 545 A.2d at 1295. Clearly, Grossman's testimony would have been general in nature, relating to concepts and theories as to the sentencing of criminal defendants, rather than offering information specific to Appellant and his crime.

Second, Appellant asserts that the trial court erred in not granting the proposed jury instruction, which would have explained Grossman's testimony and put it into context for the jury. However, because the testimony of Grossman was properly excluded, as explained *supra*, there was obviously no need for a corresponding jury instruction. If defense counsel wished to convey philosophical ideas about the inappropriateness of a capital sentence to the jury, he could certainly do so

during closing arguments, but such concepts do not properly belong in jury instructions.

Therefore, we hold that the trial court was not in error when it refused to admit the proffered testimony of Grossman and when it did not propound the requested jury instruction on his testimony. The trial court committed no abuse of discretion, and its ruling will not be reversed by this Court.

### G. Victim Impact Witness Testimony

The sixth issue is whether Appellant was deprived of a fair hearing when victim impact witness Victoria Gibson purportedly conveyed to the jury that Appellant had previously been sentenced to death for the murder of Wanda Johnson. During the sentencing hearing, Gibson was called by the State as a victim impact witness. In discussing the impact of Wanda Johnson's murder upon her family, Gibson stated: "It was two years before we went to trial, and we were trying to heal from it, and it came back. And, now, it's another two years, and we are back here again in here now. My sister was murdered, and it is just unfair to the family." Appellant argues that this comment, in conjunction with date information the jury viewed on the PSI report cover sheet, created the substantial possibility that the jury would realize that Appellant had previously been sentenced to death and that the sentence had been overturned, necessitating a new proceeding.

Appellant's claim of error was not preserved for review since defense counsel made no objection when Gibson testified and since no relief was requested. *See* part II., subsections A. and B., *supra.* *See also Ball v. State,* 347 Md. 156, 198, 699 A.2d 1170, 1190 (1997). Had Appellant's claim been properly preserved, we would find it without merit. This Court has recognized that victim impact evidence is a proper consideration for a sentencing body. *See Williams v. State,* 342 Md. 724, 762–65, 679 A.2d 1106, 1125–27 (1996); *Grandison v. State,* 341 Md. 175, 232–34, 670 A.2d 398, 425–26 (1995), *cert. denied,* 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Evans v. State,* 333 Md. 660, 684–88, 637 A.2d 117,

129–31 (1994). In addition, Md.Code (1957, 1997 Repl.Vol.), Art. 41, § 4–609(d), provides that a victim impact statement be included in the PSI report.[8] Although in *Williams,* 342 Md. at 763, 679 A.2d at 1126, we limited the admissibility of written victim impact statements to those contained in the PSI, "the victim and other persons, may, in the discretion of the judge presiding at the sentencing stage of the trial, testify in open court concerning the impact the offense had on the victim and members of his family." *Lodowski.v. State,* 302 Md. 691, 749, 490 A.2d 1228, 1257–58 (1985), *vacated on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). The opportunity for a victim, or a family member of the victim, to testify orally at a sentencing proceeding is governed by § 780(b), which provides:

> "In the sentencing or disposition hearing of a criminal or juvenile case, the court ... [s]hall, if practicable, permit the victim or victim's representative under oath or affirmation to address the judge before the imposition of sentence or other disposition ... [a]t the request of the State's Attorney ... or ... [i]f the victim has filed a notification request form under § 770 of this article ... and ... [m]ay permit the victim or victim's representative under oath or affirmation to address the judge before the imposition of sentence or other disposition at the request of the victim or the victim's representative."

 Appellant's claim that Gibson's testimony informed the jury that he had been previously sentenced to death and that the sentence had been overturned is inaccurate. The

---

8. § 4–609. Supervision of suspended sentences; presentence reports and other investigations and probationary services.

\* \* \*

"(d) *Same—Cases involving death penalty or life imprisonment.*—In any case in which the death penalty or imprisonment for life without the possibility of parole is requested under Article 27, § 412, a presentence investigation, *including a victim impact statement* as provided under Article 27, § 781 of the Code, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or § 413." (Emphasis added).

jury was made aware that Appellant had previously been tried and convicted of murder, and this prior trial was what Gibson's remarks appeared to refer to. As the record indicates, the jury was carefully and thoroughly instructed by the judge on what it was to consider in imposing a sentence on Appellant. *See Ball,* 347 Md. at 197, 699 A.2d at 1189 (holding that during a capital sentencing hearing, "the permissible scope of victim impact testimony . . . lies within the sound discretion of the presiding judge").

The cases cited by Appellant to support his position are not legally relevant to his claim. *Mills v. Maryland,* 486 U.S. 367, 381–83, 108 S.Ct. 1860, 1869–70, 100 L.Ed.2d 384, 398–400 (1988), concerned a jury being misinformed as to how to handle the unanimity issue in the mitigating factors section of the verdict sheet. *Coffey v. State,* 100 Md.App. 587, 598, 642 A.2d 276, 281 (1994), involved a second trial for the same offense where the jury heard a police officer testify that the defendant had been found guilty in the first trial. Although the trial court offered curative instructions to the jury that were designed to overcome any prejudice to the defendant, the Court of Special Appeals determined this was not sufficient and reversed the defendant's conviction in the second trial. In applying these factual situations to the instant case, we find that no erroneous instructions were given to this jury. Indeed, the record clearly demonstrates that the jury was properly instructed on every point it needed for its deliberations. Moreover, Gibson's vague comment cannot be said to have conveyed to the jurors that Appellant received the death penalty in a prior sentencing proceeding. *See Poole v. State,* 295 Md. at 193–94, 453 A.2d at 1232 (maintaining that an inadvertent reference to a previous trial, without more, does not constitute reversible error).

Therefore, for these reasons, we hold that even if the issue had been properly preserved for appeal, Appellant's claim of error is without merit.

## H. Domestic Violence Testimony

The seventh issue is whether the trial court erroneously admitted "other crimes" evidence, consisting of Monica Wil-

son's testimony that Appellant engaged in domestic violence. During the sentencing hearing, Wilson testified that she and Appellant had become romantically involved in 1991, and they lived together from February 1994 through October 1994. According to Wilson, they had "an up-and-down relationship. Sometimes it was good, sometimes it was bad.... We fought a lot, physical." The week before her mother was murdered, Wilson moved out of the home she shared with Appellant because "we were fighting a lot. He became real violent, real mean, so I left him." During this same week, Wilson returned to their home to check on Appellant and the house. When she arrived, she found Lawrence Bradshaw in her son's bedroom. Wilson testified that upon asking Appellant about Bradshaw's presence, "he told me that I was gone and it was his house and he let anybody in there that he wants. And he said next time I came in there that he was going to shoot me. And he was going to buy a chain so I couldn't get back in there." Wilson also testified that when they lived together, Appellant had a .38 caliber handgun and that she had "pulled it out on him and he pulled it out on me."

Appellant argues that Wilson's testimony constitutes evidence of domestic violence by Appellant, and that such evidence has no relevance to any legitimate issue at the sentencing hearing. Citing Md. Rule 5–404,[9] Appellant asserts that Wilson's testimony was offered to demonstrate only his criminal or violent character; thus, the trial court erred in admitting it.

Defense counsel did not object to any of Wilson's testimony relating to Appellant's violent temperament, and so

---

9. **Rule 5–404. Character evidence not admissible to prove conduct; exceptions; other crimes.**

\* \* \*

"(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident."

Appellant's claim of error was not preserved for review. *See* full discussion in part II., subsection A., *supra*. Appellant maintains, however, that because this domestic violence testimony was admitted in the first sentencing proceeding and was an issue even through the appeal of that sentencing, the trial court was on notice that Appellant had a continuing objection to it during the second sentencing hearing, which negated the requirement that Appellant formally object. Appellant's argument is in total contradiction to Md. Rule 4–323(a), which requires Appellant to object in order to preserve the issue for review. Appellant's failure to object at the time the evidence was admitted effectively precluded the trial court from applying the evidentiary protections set forth in the capital sentencing statute, Md. Rule 5–404(b) and Md. Rule 5–403, *i.e.*, whether the prejudice of admitting the evidence outweighs its probative value. *See* footnote 2. Our case law interpreting Md. Rule 5–404(b) clearly holds that the weighing component of the test for admitting other crimes evidence "implicates the exercise of the trial court's discretion." *Terry v. State*, 332 Md. 329, 335, 631 A.2d 424, 427 (1993)(quoting *State v. Faulkner*, 314 Md. 630, 635, 552 A.2d 896, 898 (1989)). Without an objection and the trial court's response in the record, we cannot say whether the trial court abused its discretion, and we will only reverse if the error caused substantial prejudice to Appellant.

Even if defense counsel had objected to this testimony during the second sentencing proceeding, we would adhere to our findings in *Conyers I*, where we addressed Appellant's similar objection as follows:

"Although Appellant found nothing objectionable about these statements at the time they were made, he now contends that the statements in question were 'other crimes' evidence admitted without the appropriate procedural analysis required by *Faulkner*.... In one of the statements, Ms. Wilson testified that her relationship with Appellant had become violent and that if she returned to the home that she and Appellant shared, one of them would do harm to the other....

We think it highly unlikely that Ms. Wilson's statements prejudiced the jury to such a degree that a new trial or sentencing hearing would be warranted, but *we also point out that Appellant did not preserve the issue for our review.* Maryland Rule 4-323(a) states, in part: 'An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived.' *Appellant made no such objection until he drafted his brief to this Court.*" (Emphasis added).

345 Md. at 562, 693 A.2d at 798–99. We then quoted Md. Rule 8-131(a) and stated: "Thus, there exists a presumption that this Court will not review any issue that has not been preserved via objection at trial." *Conyers I*, 345 Md. at 563, 693 A.2d at 799. We also declined to exercise our discretion to apply the plain error doctrine, holding that "[s]uch extenuating circumstances are not present in this case, and, indeed, we would find no error if the issue were presented." *Id.*

In the instant proceeding we cannot say that, had Appellant properly preserved his claim of error for appeal, Appellant would have succeeded in showing the evidence was improperly admitted. Section 413(c)(v), governing the admissibility of evidence in a capital sentencing proceeding, provides the trial court with the authority to admit "any ... evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements." Since Wanda Johnson and Lawrence Bradshaw were both shot with a .38 caliber handgun, Wilson's testimony in the sentencing proceeding that Appellant had a .38 caliber handgun and that they had pulled it out on each other helped the prosecution establish that Appellant was a principal in the first degree to Wanda Johnson's murder, which the State was required to prove under the death penalty statute. *See* § 413(e)(1). Moreover, in other capital sentencing proceedings we have upheld the admission of "other crimes" evidence after concluding the evidence was appropriate for considering in whether to apply the death penalty. *See, e.g., Hunt v. State*, 321 Md. 387, 431–32, 583 A.2d 218, 239

(1990)(holding that evidence of defendant's institutional misconduct was properly admitted); *Collins*, 318 Md. at 294–95, 568 A.2d at 13–14 (similar holding). In *Hunt*, we upheld the admission of bad act evidence in the sentencing proceeding, including defendant's possession of weapons and letters from the defendant describing escape plans that were never culminated. We explained why evidence of other crimes is treated differently in a capital sentencing proceeding than in the guilt/innocence phase of trial. "[The Defendant] stood before the court as a convicted murderer, not as an accused defendant entitled to the presumption of innocence. While irrelevant to the guilt/innocence phase of a criminal trial, [the defendant's] 'dangerousness,' as exemplified by his past conduct, was relevant in the sentencing phase of the trial." *Hunt*, 321 Md. at 432, 583 A.2d at 240. We do not suggest that any evidence of dangerousness or past violence is admissible; the trial court must evaluate the reliability of the evidence and its prejudicial impact on the defendant. *See Scott v. State*, 297 Md. 235, 252–53, 465 A.2d 1126, 1135–36 (1983). Wilson's testimony in this case is not significantly prejudicial, and, as in *Hunt*, in this case the evidence is "reliable information ... which is of probative value and relevant to sentencing[,] ... [and] the defendant [was] accorded a fair opportunity to rebut any statements." *Hunt*, 321 Md. at 431–32, 583 A.2d at 239.

Finally, we note that, at least initially, the trial court may have considered the testimony favorable to Appellant. Wilson stated that only a week before the murder the couple had been fighting and that Wilson moved out of the home she shared with Appellant. The hostile break-up of the relationship could have been initially viewed as supporting a mitigating circumstance involving Appellant's emotionally disturbed state of mind at the time of the murder. *See* § 413(g)(4)(delineating as a mitigating circumstance the emotional disturbance of defendant if sufficiently substantial, *inter alia*).

For similar reasons, we cannot say that if Appellant had preserved his objection and the evidence had been im-

properly admitted, he was so substantially harmed by Wilson's testimony as to require reversal. Wilson's testimony concerning the violent nature of their relationship constituted a minor part of her full testimony, of which other portions were far more incriminating and more likely to be of significance to the sentencing jury. Wilson testified, for example, to arriving at her mother's house, hearing her mother's screams before she fled for help, and to being informed of her mother's death. *See* part I, *supra.* As we noted in *Conyers I,* "it [is] highly unlikely that Ms. Wilson's statements prejudiced the jury to such a degree that a new trial or sentencing hearing would be warranted." 345 Md. at 562, 693 A.2d at 799. For all these reasons, we hold that the trial court did not erroneously admit "other crimes" evidence consisting of domestic violence testimony. Thus, we reject Appellant's seventh point of error.

## I. Motion Regarding Murder of Lawrence Bradshaw

The eighth issue is whether the trial court erroneously denied Appellant's motion to preclude evidence that Appellant had been convicted of the murder of Lawrence Bradshaw. Specifically, Appellant maintains that, while it was proper to include the fact of a prior murder conviction in the PSI that was submitted to the jury for consideration, it was prejudicial error to include the victim's name. Appellant argues that the inclusion of this information allowed the jury to draw prejudicial inferences from the fact Appellant had been convicted of Bradshaw's murder.

Before the sentencing hearing, Appellant filed a motion *in limine* to exclude evidence regarding the murder of Bradshaw, along with the fact that Appellant had been convicted of this murder. After hearing from both sides, the court ruled that "the fact of the murder was admissible but not the evidence concerning it." The trial court further stated: "The Court believes that [it] is appropriate to make the jury aware that the defendant has been found guilty of the first degree murder of Lawrence Bradshaw, and the Court will deny the motion *in limine* with respect to that." Thus, the PSI that was submitted to the jury for consideration

contained Bradshaw's name, in the context that he was a homicide victim. As an initial matter, Appellant's claim of error was not preserved for review. At no time during the hearing did the State call any witness to offer evidence as to the murder of Bradshaw. Therefore, there was no testimony for the defense to object to. Near the close of the proceedings, however, the trial court provided counsel with redacted copies of the PSI report. When asked by the court to review the PSI, defense counsel maintained that it was "[s]atisfactory to the defense," whereupon it was admitted without objection. Thus, Appellant's claim of error as to the PSI is not properly before this Court. In *Watson v. State*, we stated:

"In *Prout v. State*, 311 Md. 348, 535 A.2d 445 (1988), we concluded that when a trial judge makes a final ruling on a motion *in limine* to admit evidence, the party opposing the admission of the evidence must subsequently object at trial when the evidence is offered to preserve his objection for appeal. *Prout*, [311 Md. at 356–57,] 535 A.2d at 449. In the case *sub judice*, the trial judge ruled prior to trial on the motion *in limine* to admit Watson's prior convictions. Thus, standing alone, Watson's objection to the trial court's pretrial ruling would be insufficient to preserve his objection for our review."

311 Md. 370, 372–73 n. 1, 535 A.2d 455, 457 n. 1 (1988). In the instant case, not only did defense counsel fail to object when the PSI was offered into evidence for jury consideration, but he went so far as to inform the trial court that the PSI was satisfactory.

If this issue were properly before us, we would find Appellant's claim of error is without merit. Section 413(c)(1) provides for the admissibility of evidence in a capital sentencing proceeding, with subsection (iv) allowing for the introduction of "[a]ny presentence investigation report." A sentence recommendation and inflammatory details of unrelated crimes are to be excluded from a PSI. Appellant asserts that the inclusion of Bradshaw's name on the PSI as the victim of a prior murder conviction was an inflammatory detail of an unrelated crime that prejudiced Appellant as to the jury's final

sentence. Specifically, Appellant argues that the jury's knowledge that he killed a participant in the Wanda Johnson break-in unfairly bolstered the State's position that Appellant was heavily involved in the crime, likely as a principal in the first degree.[10] In support of his contention that the identity of Bradshaw in the PSI qualified as an "inflammatory detail" that would lead the jury to sentence him to death for the Wanda Johnson murder because he had already been convicted for the Bradshaw murder, Appellant cites *Conyers I*, where we stated: "In *Scott*, this Court interpreted § 413(c)(1)(iii) to preclude, in a death penalty case, 'inflammatory detailed evidence of the underlying facts and circumstances surrounding unrelated crimes.' "[11] 345 Md. at 573, 693 A.2d at 804 (quoting *Scott*, 297 Md. at 247, 465 A.2d at 1133).

We disagree with Appellant's contention for two reasons. First, quite simply, Bradshaw's name, in and of itself, was not an inflammatory detail. As mentioned, during the hearing the State did not offer any evidence of the Bradshaw murder. Therefore, except for his name appearing in the PSI as a homicide victim, the jury did not receive any evidence during the proceeding from which to draw a prejudicial inference. Second, in contrast to Appellant's assertion otherwise, the Bradshaw murder was not entirely "unrelated" to the Wanda Johnson murder. In *Scott, supra,* we considered whether, in a capital sentencing hearing for premeditated

---

10. Maryland Rule 4–343 provides for the sentencing procedure in a capital case. Section I of the written findings and determinations form requires that in order for a defendant to be sentenced to death, he or she must be found to be "a principal in the first degree to the murder" beyond a reasonable doubt.

11. § 413. **Sentencing procedure upon finding of guilty of first degree murder.**

\* \* \*

"(c) *Evidence; argument; instructions.*—(1) The following type of evidence is admissible in this proceeding:

\* \* \*

· (iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures."

murder, evidence that the defendant had also committed two unrelated crimes was admissible under § 413(c)(1). Essentially, we held that the admission of two *unadjudicated* murder charges constitutes reversible error. *Scott,* 297 Md. at 252, 465 A.2d at 1136. However, in the instant case, Appellant had already been convicted of the Bradshaw murder at the time of the second sentencing proceeding. *See Scott,* 297 Md. at 248, 465 A.2d at 1133–34 (holding that "[w]hen read as a whole, § 413(c)(1) must be construed as precluding the admission of evidence relating to other crimes for which there has not been a conviction or a plea of guilty or nolo contendere"). In addition, unlike the *Scott* case, the Bradshaw conviction was not introduced as other crimes evidence nor did the State refer to any facts surrounding the Bradshaw murder in encouraging the jury to impose the death penalty on Appellant. The jurors' knowledge of the Bradshaw murder extended only to knowledge or awareness of a *related conviction,* and not to a completely *unrelated pending charge.*

Thus, for the reasons stated, we hold that Appellant's claim of error, even if preserved, is without merit and reversal is not warranted.

### J. Crime Scene and Victim Photographs

The ninth issue is whether the trial court erroneously admitted photographs of Wanda Johnson and the crime scene. Appellant argues that the photographs were irrelevant and that the prejudice resulting from their admission outweighed their probative value. In response, the State argues that the photographs are relevant because they "visually communicated the fact of the murder[ ] as well as the atrociousness of the crime."

To be admissible, the photographs must be introduced for some legitimate purpose and their probative value must outweigh the prejudice caused by their admission. *See Evans,* 333 Md. at 692–93, 637 A.2d at 133. In *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985), which involved a murder trial where several photographs of the victim were admitted, we

explained the standard of review for admitting photographic evidence during the guilt phase of trial:

"We have consistently held that whether or not a photograph is of practical value in a case and admissible at trial is a matter best left to the sound discretion of the trial judge. A court's determination in this area will not be disturbed unless plainly arbitrary. Under this standard, we have permitted the reception into evidence of photographs depicting the condition of the victim and the location of injuries upon the deceased, the position of the victim's body at the murder site, and the wounds of the victim." (Citations omitted).

303 Md. at 502, 495 A.2d at 8.

More recently in *Evans*, we observed that the application of this rule in a capital sentencing proceeding "implicates issues different from those which predominate at the guilt phase of trial." 333 Md. at 693, 637 A.2d at 133. We reiterated, however, that "[t]he need for caution ... in no way circumscribes the judge's evidentiary authority; the admission of photographs into evidence remains soundly committed to the discretion of the trial judge in capital sentencing proceedings." *Id.*

In the instant case, the photographs of Wanda Johnson depicted the circumstances of her death, including the gunshot wounds and the location of her body, which are relevant considerations at the sentencing proceeding. "The very purpose of photographic evidence is to clarify and communicate facts to the tribunal more accurately than by mere words." *Johnson*, 303 Md. at 503–04, 495 A.2d at 9. *See also Evans*, 333 Md. at 693, 637 A.2d at 133. Moreover, as we stated in *Evans*, "the photographs could certainly assist the jury in visualizing the atrociousness of the crime, a circumstance which is no less important in the sentencing context than it is to a factfinder attempting to determine the degree of murder." *Id.* Thus, we hold that the trial court did not err in admitting the photographs, and its determination to admit them was in no way "plainly arbitrary."

### K. Impeachment by Prior Convictions

The tenth issue is whether the trial court committed plain error in permitting the State to impeach defense witness Arthur Rogers with prior convictions for first and second-degree sexual assault. Arthur Rogers testified for the defense in order to cast doubt on the testimony of Charles Johnson, who claimed that Appellant confessed to him that Appellant was the principal in the first degree. Rogers said that, one day while working in the detention center, he found Charles Johnson rifling through his legal papers for information to trade to the police. Appellant argues Rogers' testimony cast significant doubt on Charles Johnson's statement regarding Appellant's jailhouse confession, but that Rogers' credibility was improperly impaired as a result of the state's cross-examination with proof of his past convictions for sexual offenses. On cross-examination, the following occurred:

[State's Attorney]: Isn't it a fact that in 1987, you were convicted of robbery in Baltimore City?

[Rogers]: Yes.

[State's Attorney]: All right. And isn't it a fact that in 1988, you were convicted of a second-degree sexual offense?

[Rogers]: Yes.

[State's Attorney]: And isn't a fact that in 1988, you were convicted of theft?

[Rogers]: Yes.

[State's Attorney]: And isn't it a fact that in 1995, you were convicted of a first-degree sexual offense?

[Rogers]: Yes.

[State's Attorney]: And you were sentenced to life without the possibility of parole?

[Rogers]: Yes.

Maryland Rule 5–609 governs impeachment by prior conviction. It provides in pertinent part:

"(a) *Generally.* For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or

established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party."

*See* footnote 2. *See also* Md.Code (1974, 1995 Repl.Vol.), Courts & Judicial Proceedings Art., § 10–905.[12]

Since defense counsel made no objection to any of the questions asked by the State, Appellant's claim of error has not been properly preserved for review. *See* full discussion in part II., subsection A., *supra.* Regardless, any error in allowing the impeachment evidence was harmless. We therefore need not decide in this case whether a first or a second-degree "sexual offense" is an "infamous crime" falling within the ambit of subsection (a)(1) of Rule 5–609.[13]

If the trial court had improperly admitted the impeachment evidence over a proper objection, we could not say that the defendant was substantially harmed by the impeachment so as to require reversal. The jury was well aware of Rogers' incarceration given that all his testimony related to events

---

**12.** Section 10–905 states in pertinent part:

> (a) *In general.*—Evidence is admissible to prove the interest of a witness in any proceeding, or the fact of his conviction of any infamous crime. Evidence of conviction is not admissible if an appeal is pending, or the time for an appeal has not expired, or the conviction has been reversed, and there has been no retrial or reconviction.

Maryland Rule 5–609 governing impeachment by prior crimes controls over any inconsistencies with the statutory provision. *See Jackson v. State,* 340 Md. 705, 712 n. 3, 668 A.2d 8, 11 n. 3 (1995); *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105, 110 (1993).

**13.** We observe that Maryland law distinguishes between the crimes of first and second-degree rape and first and second-degree sexual assault; and we have not had the opportunity to decide whether the latter offenses are "infamous crimes" for impeachment purposes. Compare *Green v. State,* 161 Md. 75, 83–84, 155 A. 164, 167 (1931)("There can be no doubt that the credibility of a witness can be impeached by proof of a conviction of the crime of rape.") with *Watson v. State,* 311 Md. 370, 376, 535 A.2d 455, 458 (1988)(holding that attempted rape is not an infamous crime for impeachment purposes).

occurring during incarceration. Appellant does not contest the use of Rogers' theft and robbery convictions for impeachment purposes, and, upon a review of the record, we cannot say that his admission to the sexual offenses was so prejudicial as to require reversal as a matter of law. Moreover, by failing to object to the testimony at the hearing, defense counsel precluded the trial court from making a determination pursuant to subsection (a)(2) of Md. Rule 5–609, *i.e.,* whether the probative value of admitting the evidence outweighs the danger of unfair prejudice to the witness. We have previously observed that this determination "is clearly a matter of trial court discretion." *State v. Giddens,* 335 Md. 205, 214, 642 A.2d 870, 874 (1994). Without the benefit of an objection and a ruling on that objection from the trial court, absent extraordinary circumstances not present in the instant case, we cannot say that the trial court abused its discretion by admitting the impeachment evidence. Therefore, even if the impeachment evidence was improper, we cannot say that the admission reached that level of magnitude of harm so as to require reversal. Thus, we hold that the trial court did not commit plain error in permitting the State to impeach Rogers with his prior convictions for first and second-degree sexual assault.

### L. Motion Regarding .38 Caliber Handgun

The eleventh issue is whether the trial court erroneously denied Appellant's motion to prevent introduction of Appellant's statement to Monica Wilson regarding a .38 caliber handgun. We note that Appellant's motion to suppress his statement to Wilson has not been preserved for review. Appellant filed a motion *in limine* to prevent the admission of Appellant's statement to Wilson concerning the .38 caliber handgun, but he did not renew his objection when the evidence was introduced during the sentencing hearing. As discussed in part II., subsection I., *supra,* when the trial court rules against the objecting party's motion *in limine,* in order to preserve the objection for review, the complaining party still must object to the admission of the evidence at the time it

is offered at trial. *See Watson,* 311 Md. at 372–73 n. 1, 535 A.2d at 457 n. 1; *cf. Prout,* 311 Md. at 356–57, 535 A.2d at 448–49. *See also* full discussion in part II., subsection A., *supra.*

Even if Appellant had properly objected, however, we would find no merit to his argument that the Sixth Amendment of the United States Constitution compels that the statement concerning the handgun be suppressed.[14] As it has been interpreted by the courts, the Sixth Amendment of the United States Constitution prohibits, absent a waiver, the admission of a statement by a criminal defendant when the statement is made (1) outside the presence of legal counsel; (2) in response to interrogation by the State; and (3) after the right to counsel has attached with respect to the charge being tried. *See generally Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Whittlesey v. State,* 340 Md. 30, 665 A.2d 223 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996).

As in the *Whittlesey* case, the State in the instant case does not contest that Wilson was acting as an agent of the State or that Appellant's statement was made outside the presence of counsel; the issue before us concerns only the third requirement, *i.e.,* whether the right to counsel had attached. The general rule is that " 'a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.' " *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146, 154 (1984)(quoting *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32

---

**14.** The Sixth Amendment provides that "[in] all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel." The Sixth Amendment applies to the states through the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

L.Ed.2d 411, 417 (1972)); *see also Whittlesey,* 340 Md. at 49, 665 A.2d at 232 (quoting *Gouveia).* Not just any adversary proceedings invoke the constitutional protections, however, because " 'the Sixth Amendment right [to counsel] ... is offense-specific.' " *Whittlesey,* 340 Md. at 50, 665 A.2d at 232–33 (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166 (1991)). Appellant does not dispute that adversarial proceedings had not commenced against Appellant concerning Wanda Johnson's murder at the time his statements were made, but he asks that we recognize what has been called the "carry-over" exception to the well-established rule that the Sixth Amendment right is offense-specific. Under this exception, a defendant charged with one crime may invoke the Sixth Amendment to suppress statements related to another uncharged crime that would otherwise be admissible, but only if the second crime is sufficiently related to the first crime. *See Whittlesey,* 340 Md. at 51–52, 665 A.2d at 233 (citing cases that have recognized the existence of such an exception). Appellant's contentions are summarized by the argument his counsel made to the trial court during pre-sentencing hearing motions:

"The statements regarding the .38 were made to Monica Wilson ... when Mr. Conyers was in custody. He had been charged in the Bradshaw offense. He had not been charged as yet in the Johnson homicide. She was a State agent at the time those were made. We are just going to make a brief argument on Sixth Amendment grounds that the Sixth Amendment right had attached at the time he was charged with the Bradshaw [murder], and while the Sixth Amendment is certainly offense-specific, the Supreme Court has recognized that carry-over exceptions that the right can attach to offenses that have not yet been charged if those offenses are closely related, and if there is—it's even been held to say inextricably related.

It's been addressed by the Court of Appeals in 1995 in a case called *Whittlesey v. State* where they agree that there can be a carry-over, and that that carry-over has to occur when proof for the two crimes is essentially identical, and

because the .38 was used in both of those offenses, according to the ballistics expert, we would argue that that evidence is identical, and for that reason, we would ask that that statement not come in on the Sixth Amendment."

The State argues in response that Appellant's Sixth Amendment rights had not attached at the time of his conversations with Wilson because at that point he had only been charged with the murder of Bradshaw, and not Wanda Johnson. Further, the State contends that the carry-over exception does not apply since the murder of Wanda Johnson and the murder of Bradshaw were not sufficiently closely related.

We agree with the State that the Sixth Amendment would not prohibit the admission of Appellant's statement even if he had properly preserved his objection. Initially, we note that Appellant incorrectly cited *Whittlesey* at the hearing on presentencing motions to stand for our acceptance of the "carry-over" exception to the general rule that the Sixth Amendment is offense-specific. In *Whittlesey*, we explored in great detail the carry-over exception as it has developed in the wake of the Supreme Court's decisions in *Moulton, supra,* and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). We questioned whether these two cases compelled recognition of the carry-over exception. *Whittlesey,* 340 Md. at 52 & n. 8, 665 A.2d at 233–34 & n. 8. We acknowledged that in Maryland this question was one of first impression and stated that "we will not decide whether the Sixth Amendment ever requires carry-over from one offense to another, but instead will focus on whether the offenses involved in this case are closely related to each other. If they are not, then there was no Sixth Amendment violation." *Whittlesey,* 340 Md. at 53, 665 A.2d at 234. Thus, Appellant's contention that in *Whittlesey* we stated our "agreement" that there is a carry-over exception is misplaced. Nevertheless, as in *Whittlesey,* we shall assume, *arguendo,* that such an exception exists and determine whether it would apply in the instant case.

After exploring the cases addressing the carry-over exception, we stated in *Whittlesey:*

"The unifying theme among the Sixth Amendment cases has been that the right to counsel carries over only to new charges arising from the same acts on which the [pending] charges were based. To determine whether the same acts underlie both charges, courts have looked for identity of time, place, and conduct. Some have also required identity of prosecuting sovereign. Another test employed by at least one court is whether the statements elicited by the police constituted evidence of both offenses." (Citations and internal quotations omitted).

340 Md. at 55, 665 A.2d at 235. After reviewing various cases that considered the "carry-over" exception, we concluded that it did not apply in that case to exclude Whittlesey's statements to an informant that implicated him in a murder. Applying the identity of time, place, and conduct test, we observed that Whittlesey's statements had been made after he had been charged with making false statements to a state official regarding the investigation of the same murder. We concluded that "the false statements charge and the murder charge are not 'closely related' offenses. The false statements occurred days after the murder, in another location. The conduct was also distinct; ... committing a crime is separate from an attempt to avoid responsibility for it." *Whittlesey*, 340 Md. at 56, 665 A.2d at 236.

As in *Whittlesey*, in the instant case there is no identity of time, place, and conduct. The statement Appellant seeks to suppress occurred before Appellant was ever charged with the Johnson murder, which was an event distinct from the Bradshaw murder. Although Appellant had been charged with the Bradshaw murder, that murder involved separate conduct which took place at a different location more than 24 hours after the Wanda Johnson murder. Moreover, *Whittlesey* expressly recognized that "committing a crime is separate from an attempt to avoid responsibility for it." *Id.* Thus, *Whittlesey* compels our rejection of Appellant's argument that simply because the Bradshaw murder was committed to conceal the Wanda Johnson murder the two are sufficiently "closely related" for the purposes of the carry-over exception.

While most courts have considered the identity of time, place, and conduct test for application of the carry-over exception, Appellant looks to the same evidence test, which, as we acknowledged in *Whittlesey*, had been employed by a lower Pennsylvania court to determine whether the carry-over exception applied. *See In re Pack*, 420 Pa.Super. 347, 616 A.2d 1006 (1992). Appellant contends that since the statement regarding the .38 caliber handgun "was used in both of those offenses, according to the ballistic expert, we would argue that that evidence is identical." For this reason, Appellant contends that the carry-over exception should apply.

While we believe that the test of identity of time, place, and conduct more accurately reflects the Sixth Amendment considerations at issue, we need not consider which test is preferable since we believe that Appellant misinterprets the applicability of the same evidence test. In *Whittlesey*, after we concluded that the identity test did not apply to carry-over the defendant's Sixth Amendment rights, we also addressed the same evidence test. We acknowledged that Whittlesey's statements to the State's informant could be used to support the false statements charge as well as the murder charge, but we also observed that the State could have proved the false statements charge without proving the murder charge. *Whittlesey*, 340 Md. at 56–57, 665 A.2d at 236. We noted that the "false statements charge could have been supported by [other] evidence.... Furthermore, the State could disprove many of appellant's statements to the police ... without having to show that appellant had killed [the victim]." *Id.* Similarly, in this case the State could have proved that Appellant killed Bradshaw without the statement at issue and without showing Appellant had killed Johnson. Thus, as we stated in *Whittlesey*, "the proof for the two crimes does not necessarily require identical evidence." 340 Md. at 57, 665 A.2d at 236.

In sum, Appellant failed to preserve his eleventh point of error regarding the admissibility of his statement regarding the .38 caliber handgun. Even if he had properly preserved his objection, Appellant's statement would not fall within the carry-over exception to the general rule that the Sixth Amend-

ment right to counsel attaches only when adversary proceedings have begun with respect to the specific offense charged. Thus, we hold that the trial court did not err when it denied Appellant's motion to prevent the introduction of Wilson's statement concerning the .38 caliber handgun.

M. Constitutionality of Maryland's Death Penalty Statute

The final issue that we shall address is whether Maryland's death penalty statute is unconstitutional. Specifically, Appellant argues the State's death penalty statute is unconstitutional as applied to his case and that it is facially unconstitutional. Regarding Appellant's first claim, he maintains that because the jurors found no mitigating circumstances they were compelled to impose the death penalty. Appellant asserts that such mandatory death penalty laws violate the cruel and unusual punishment prohibition of the Eighth and Fourteenth Amendments of the United States Constitution.

We hold that the fact the jurors found no mitigating circumstances did not unconstitutionally compel imposition of the death penalty. In *Hunt v. State*, a case in which Hunt made a similar argument as Appellant, we stated:

"Hunt argues that the sentencing form unconstitutionally makes the death penalty 'mandatory' because it indicates that the jury should enter 'death' as the sentence if it finds that the aggravating circumstances outweigh the mitigating circumstances. We rejected a similar contention in *State v. Tichnell*, 306 Md. 428, 467, 509 A.2d 1179, 1199 (1986) . . . ; accord *State v. Calhoun*, 306 Md. at 739, 511 A.2d at 485.

The Supreme Court addressed this issue recently in *Blystone v. Pennsylvania*, 494 U.S. [299], 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). The Court upheld the Pennsylvania death penalty statute which provided that ' "[t]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." ' *Id.* at [302], 110 S.Ct. at 1081, 108

L.Ed.2d at 261 (quoting 42 Pa.Cons.Stat. § 9711(d)(6) (1988)). Addressing whether the provision unconstitutionally mandated the death sentence, the Court said:

'Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances. * * . * '

*Id.* at [305], 110 S.Ct. at 1082–83, 108 L.Ed.2d at 263.

The Maryland death penalty sentencing form ... is essentially identical to the Pennsylvania statute. It provides that the jury enter 'death' under the same circumstances as the Pennsylvania statute. Hunt's requested instruction was not 'necessary to prevent the Maryland death sentence form from unconstitutionally mandating the death penalty.' "

321 Md. at 443–44, 583 A.2d at 245–46. *See also Evans,* 333 Md. at 696, 637 A.2d at 135 (holding that the "statutory scheme ... requires a jury to impose a death sentence when no mitigating circumstances are found if at least one aggravating factor has been established")(quoting *Scott v. State,* 310 Md. 277, 289, 529 A.2d 340, 345 (1987)). In the instant case, the trial court properly instructed the jury on how to consider the aggravating and mitigating factors in determining the appropriate sentence. Thus, because we find that the jurors were carefully and properly instructed, Maryland's death penalty statute was not unconstitutionally applied to Appellant's case.

Appellant's second claim is that Maryland's death penalty statute is facially unconstitutional because (1) it requires the defendant to establish mitigating circumstances; (2) it requires the defendant to establish that non-enumerated mitigating circumstances are, in fact, mitigating; and (3) it requires the State to prove that the aggravating circumstances outweigh the mitigating circumstances by only a preponderance of the evidence rather than by some higher standard.

In holding that Maryland's death penalty statute is not facially unconstitutional, we reiterate the following from *Conyers I*, 345 Md. at 576, 693 A.2d at 805–06 (quoting *Perry v. State*, 344 Md. 204, 247–48, 686 A.2d 274, 295 (1996), *cert. denied*, 520 U.S. 1146, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997)):

"We have addressed these claims in prior cases and have rejected each of them. *See Grandison v. State*, 341 Md. 175, 231, 670 A.2d 398, 425 (stating that a similar claim, 'though made time and time again over the years, has been consistently rejected by this Court'), *cert. denied*, 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Whittlesey v. State*, 340 Md. 30, 82–83, 665 A.2d 223, 249 (1995)(rejecting similar constitutional challenges to Maryland death penalty statute), *cert. denied*, [516] U.S. [1148], 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Wiggins v. State*, 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991)(finding no merit in challenges to defendant's burden regarding statutorily recognized and other mitigating factors and to burden of proof), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992)."

*See also Clermont v. State*, 348 Md. 419, 456, 704 A.2d 880, 898, *cert. denied*, —— U.S. ——, 118 S.Ct. 1849, 140 L.Ed.2d 1098 (1998); *Burch v. State*, 346 Md. 253, 299, 696 A.2d 443, 466, *cert. denied*, —— U.S. ——, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997)(rejecting arguments similar to Appellant's that the Maryland death penalty statute is facially unconstitutional).

## N. Other Considerations

In addition to considering the arguments advanced by Appellant in this appeal, we have also considered the imposition of the death sentence from the standpoint of the factors set forth in Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 414(e), and we make the following determinations:

1. The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

2. The evidence supports the trial court's findings of a statutory aggravating circumstance under § 413(d); and

3. The evidence supports the trial court's finding that the aggravating circumstances outweigh the mitigating circumstances.

**JUDGMENT AFFIRMED.**

Dissenting opinion by RAKER, J., in which BELL, C.J., · and ELDRIDGE, J., join.

RAKER, Judge, dissenting:

I would reverse the judgment of the Circuit Court for Wicomico County and remand the case for a new sentencing proceeding. Accordingly, I respectfully dissent.

The trial court committed reversible error in several respects: (1) in permitting Detective Marll to express an opinion that key prosecution witness Charles Johnson was credible; and (2) in erroneously restricting the direct examination of defense witnesses Arthur Rogers and Ventura McLee.

*The Preservation Issues*

As a threshold matter, I disagree with the general approach taken by the majority with respect to the question of preservation of issues for appellate review. Maj. op. at 147. The majority goes to great length to emphasize that " 'the tried and tested rules of evidence and procedure still apply [in death penalty cases],' " maj. op. at 150 (*quoting Bruce v. State*, 328 Md. 594, 611, 616 A.2d 392, 400 (1992)), and

> that where counsel wishes to object to the admission of any evidence, he or she must do so in a timely fashion or the issue will not be preserved for review. Counsel should not rely on this Court, or any reviewing court, to do their thinking for them after the fact. Furthermore, we have stated that even in a death penalty case, with the potential finality of its outcome, litigation cannot continue *ad infinitum* through counsel 'withholding issues or framing the questions differently each time.' *Foster*, 305 Md. at 316, 503 A.2d at 1331.

Maj. op. at 151. Then, in apparent contradiction to the previous exhortations, the majority proceeds to "exercise [its] discretion and briefly discuss all of the issues Appellant raises, including the eight unpreserved ones." Maj. op. at 151.

When addressing issues that are not preserved, I suggest the following framework. First, Rules 4–325, with respect to jury instructions, 5–103, with respect to rulings on evidence, and 8–131, with respect to trial error generally, apply as much in capital cases as they do in other cases. There is no exception stated in any of those rules for capital cases. Second, each of those rules, explicitly or implicitly, permits an appellate court to address and resolve otherwise unpreserved issues. Third, ordinarily, the appellate court will not exercise that discretion. It is important that the rules retain vitality and not be regarded as merely hortatory. They have the salutary purposes of allowing all issues to be resolved in the first instance by the trial court, preventing the unfairness of allowing a party to try the case on one theory and conceal and reserve other issues for appeal in the event that theory proves unsuccessful, and averting unnecessary appeals. Finally, in a capital case, because the ultimate issue is one of life or death, this Court should more readily exercise its discretion to review an unpreserved issue when the challenged ruling, if wrong, would have been truly prejudicial and the failure to preserve was likely not a matter of trial tactics.

In deciding whether or how to exercise its discretion, this Court has essentially three choices: (1) hold the matter unpreserved and not address it at all, leaving the reason for and prejudice *vel non* caused by the non-preservation to post-conviction; (2) hold the issue unpreserved but affirmatively exercise the discretion allowed under the rules to address and resolve the issue on the merits; or (3) hold the matter unpreserved but address the issue only by way of *dicta*, for the guidance of a subsequent post-conviction court.[1]

---

1. For example, the Court might state:

With respect to jury instructions, Rule 4–325(e) states that an appellate court may "take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." This suggests a three step inquiry, once a failure to object is found. First, was the instruction erroneous? If not, there is nothing to notice. Second, if it was erroneous, did it amount to "plain error?" Third, if it was plain error, "was the error material to the rights of the defendant?" Because errors in jury instructions are generally errors of law, rather than of fact, it is difficult for me to distinguish between ordinary and plain errors, so the inquiry may really be a dual one. That is, if the instruction was sufficiently erroneous that, had the proper objection been made, we would reverse, then the appellate court should examine the question of prejudice.

The three basic options should be applied on a case-by-case and issue-by-issue basis. If the ruling would be that the alleged error was not error, or that in the case of a jury instruction, it was not material to the rights of the defendant, or that it was harmless under a broader harmless error analysis, we should, ordinarily, either not address the unpreserved issue or hold that it was unpreserved and address it only in *dicta*. That should be the general practice. It preserves the vitality of the rules, implements their salutary function, and does no practical harm to the defendant.

There are two circumstances in which a different practice may be justified. One is if, for whatever reason, guidance on the issue is important in other cases; it is somewhat the same justification for addressing moot points. *See Coburn v. Coburn*, 342 Md. 244, 250, 674 A.2d 951, 954 (1996) (stating that the Court "may address the merits of a moot case if [it] is convinced that the case presents unresolved issues in matters of important public concern that, if decided, will establish a

---

Because the issue was not preserved, we shall not address it in this appeal. Had we addressed it, however, we would have found (i) no merit because ..., or (ii) that any error was harmless beyond a reasonable doubt because....

rule for future conduct"). The more frequent circumstance, especially in, but not necessarily limited to, a capital case, is when we conclude either that the error was truly prejudicial, or in the case of a jury instruction, was material to the rights of the defendant. A finding of prejudice or materiality, in that sense, necessarily precludes a determination that the error was harmless and probably would suffice to satisfy the prejudice prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). From the perspective of both fairness and efficient judicial administration, therefore, we should address and resolve the issue and not leave it to future collateral proceedings.

Under this approach, in this case, this Court should examine each of the unpreserved issues and determine which of the three basic options to take. If, in examining the issue, we would conclude either that there was no error, or that the error was harmless, (or in the jury instruction issue, not material to Conyers's rights), we should adopt either the first approach of holding the issue unpreserved and not addressing it at all or the third approach of holding the issue unpreserved and addressing it only in *dicta.* If the issue would have resulted in a reversal had it been preserved and there is no indication that the non-preservation was a matter of deliberate trial tactics, we should hold it unpreserved but affirmatively exercise and resolve it as a holding. When we make clear that we are exercising discretion, there is no inconsistency between the holding of non-preservation and resolution of the issue on the merits.

### Detective Marll's Testimony about Charles Johnson

The majority holds that "Appellant was not deprived of a fair hearing by Marll's testimony regarding prosecution witness Charles Johnson, and reversal is not warranted." Maj. op. at 154. I disagree.

Whether Appellant was a principal in the first degree was a critical issue for this sentencing jury. *See* Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 413(e)(1); *Baker v. State,*

332 Md. 542, 570, 632 A.2d 783, 796 (1993) (holding that under Maryland law, except in murder-for-hire cases, only those individuals found guilty of first degree murder as a principal in the first degree may be sentenced to death). Charles Johnson, an inmate at the Maryland Department of Corrections, was the State's primary witness on this issue. Thus, his credibility was central to the question of whether Conyers was eligible for the death sentence. The defense case consisted primarily of an attack upon the credibility of Charles Johnson in an attempt to convince the jury that Conyers never confessed to Johnson, the jailhouse snitch, that he shot Wanda Johnson.

Although the issue was not preserved for appellate review because there was no objection to the testimony at trial, the majority holds that there was no error. The majority reasons that Marll did not offer an opinion as to Johnson's credibility as a witness but rather, that he was simply testifying as to the verified accuracy of Johnson's statements, and that he had compared each of them against the documents in the case. Maj. op. at 154. The majority believes that Marll was testifying as to whether Johnson's *information*, not Johnson himself, was found to be accurate and therefore truthful. I find this rationale unsound.

Marll's testimony violates the well-settled principle that a witness is not permitted to express an opinion as to whether another witness is telling the truth. As we said in *Bohnert v. State*, 312 Md. 266, 278, 539 A.2d 657, 663 (1988), "[t]estimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." To me, the testimony *"[t]hese statements which I knew upon hearing them from Mr. Johnson to be truthful, and I was able to verify each and every statement that he gave us"* can be interpreted only as an expression of the witness's opinion bearing on the credibility of another witness, Johnson.

Clearly, the issue was not preserved for appellate review because defense counsel lodged no objection. This evidence would fall into category two of my suggested framework for

addressing preservation issues. I would hold the issue unpreserved but would affirmatively exercise the discretion allowed under the rules to address and resolve the issue on the merits. This is a capital case, the evidence is highly prejudicial, and there is no indication that the non-preservation was a matter of deliberate trial strategy. The evidence was elicited by the State in rebuttal, and the witness's response was an unanticipated, gratuitous comment on Johnson's credibility. I would hold that the admission of Marll's testimony regarding Charles Johnson deprived Appellant of a fair hearing and constitutes reversible error.

### Direct Examination of Arthur Rogers

During direct examination of Arthur Rogers, defense counsel sought to introduce two statements: Rogers's warning to Conyers that he should not talk to Johnson because Johnson was looking at court documents of inmates, and Johnson's statement that "you need to take care of number one first" as his reason for looking into the court documents of other inmates. The majority concludes that the evidence was properly excluded on several grounds. First, the majority emphasizes that while the court excluded defense counsel's desired evidence, the judge permitted Rogers to testify that he warned Appellant not to talk with Johnson about his case, and that the trial judge properly exercised his discretion in limiting the testimony. Maj. op. at 154. Second, the majority concludes that the statement that Johnson was taking care of number one first was inadmissible hearsay. Maj. op. at 158 – 59. Third, the majority holds that any alleged error was harmless beyond a reasonable doubt. Maj. op. at 160.

I agree that the testimony proffered by the defense, that Johnson had told Rogers "you need to take care of number one first," was hearsay. There is no evidence, proffered or otherwise, that Rogers told Conyers of Johnson's alleged statement that "he was looking out for number one first."

Rogers's proffered testimony that he had warned Conyers that he should not talk to Johnson because Johnson was

looking through other inmates' court documents was improperly restricted. This evidence was admissible to render it less likely that Conyers spoke to Johnson at all, because the warning not to talk to Johnson, and the statement to Conyers that Johnson was looking through inmates' papers would have caused a person motivated by rational self-interest to realize that Johnson was only gathering information for his own purposes, and should therefore be avoided. The critical point Conyers wished to convey to the jury was that Conyers, if informed of activity attributed to Johnson, would not have spoken to him. While the court permitted Conyers to ask Rogers whether he advised Conyers not to talk, the court did not permit Rogers to relate that he told Conyers that Johnson was looking at other inmates' papers. Because the testimony was restricted, the defense was unsuccessful in conveying to the jury that Rogers not only warned Conyers not to speak to Johnson, but also explained to Conyers that Rogers had observed Johnson "rifling" the court records of others.

The information contained *within* Rogers's warning to Conyers had bearing on Conyers' state of mind, which in turn went directly to the credibility of Johnson's testimony. Johnson testified that Conyers told him that Conyers was the shooter. The defense theory was that if Conyers was warned of Johnson's behavior, he would not have talked to Johnson. If the jury had heard this evidence, it may not have believed Johnson. Evidence that would have made it less likely that Conyers would have confessed to Johnson, and thus more likely that Johnson's testimony was false, would have been central to the critical issue of principalship. Principalship directly governs Conyers's eligibility for a death sentence. The evidence was admissible, and its exclusion cannot be considered harmless.

Because of the importance of Johnson's testimony in this case, and the critical role his testimony played in the jury's determination of principalship, the trial court abused its discretion in excluding the evidence. Moreover, the error was not harmless. *See Dorsey v. State,* 276 Md. 638, 350 A.2d 665

(1976). For this reason, I would reverse the sentence of death and remand for a new sentencing proceeding.

### Direct Examination of Ventura McLee

The excluded testimony of the warnings told to Conyers by McLee was admissible for the same reasons that Rogers's testimony was admissible. Counsel attempted to elicit the substance of McLee's advice to Conyers about speaking with Johnson and his warnings not to speak to Johnson. The evidence was not hearsay and was offered by the defense to show that Conyers, having been warned not to talk to Johnson, and having been told of the reasons underlying the warnings, was less likely to actually have spoken to Johnson. The trial court prevented the witness from telling the jury the substance of the advice he gave to Conyers. As discussed earlier, the jury could have found that McLee's testimony tended to make it less likely that Conyers would have spoken to Johnson, and in turn more likely that Johnson's testimony was not credible. Because Johnson's credibility was so crucial to the State's case, I cannot say that the error was harmless.

As for the preservation issue, I would find that the error was preserved. Non-preservation should not be applied in such a technical fashion as to ignore the obvious, and to the reality of the dynamics in the courtroom. In my view, it was fairly obvious to the trial judge that defense counsel was seeking the same information from McLee as he sought from Rogers. When the answer to a question is obvious, counsel need not proffer the substance of an answer sought. *See Mills v. State*, 310 Md. 33, 46, 527 A.2d 3, 9 (1987), *vacated and remanded on other grounds* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

### Victim Impact Witness Testimony

Defense counsel made no objection to the evidence Conyers now claims deprived him of a fair hearing. I would hold that this evidence falls within category one: that the matter was unpreserved and I would not address it at all. Failure to object to victim impact testimony may be a strategic decision

by counsel to avoid alienating the jury. The majority holds that although the issue is not preserved for appellate review, the trial court committed no error; and that assuming error, it was harmless. The majority addresses the merits of the claim and holds that the issue has no merit. Maj. op. at 177. The majority reasons that the jury had not been made aware that Appellant had been previously sentenced to death and that the sentence had been overturned, but simply that he had been tried and convicted of murder, and that Gibson's remarks appeared to refer to this prior trial. Maj. op. at 179. Reasoning that Gibson's vague comment cannot be said to have conveyed to the jurors that Appellant received the death penalty in a prior sentencing proceeding, the majority holds that even if the claim of error was preserved, it is without merit; moreover, if error, it is harmless. Maj. op. at 179.

The issue was not preserved, and I would not address it. The testimony in question included the following comments: "It was two years before we went to trial, and we were trying to heal from it, and it came back. And, now, it's another two years, and we are back here again in here now. My sister was murdered, and it is just unfair to the family." Because the majority considers the issue, and holds that there was no error, I simply note that in my view, the comment was not admissible; it was not relevant to any issue before the jury; and thus, it was error. *See Williams v. State*, 342 Md. 724, 736, 679 A.2d 1106, 1113 (1996).

### Domestic Violence Testimony

Appellant claims the court erred in admitting testimony in the nature of "other crimes" evidence. The evidence consisted of Monica Wilson's testimony that the week before the killing, Appellant became violent, mean, and threatened to shoot her; and her testimony that, when Appellant and Wilson lived together, Appellant owned a .38 caliber handgun that she "had pulled ... out on him and he pulled ... out on [her]."

No objection was lodged at trial to this testimony. I agree with the majority that Appellant's objection at the earlier

sentencing proceeding did not preserve the issue for review. I would hold that the issue falls within category one: that it was not preserved for appellate review, and I would not address it at all, leaving the issue for consideration on post-conviction. The majority addresses the merits of the claim of error, and does so, in a manner that does violence to the rules regarding "other crimes" evidence in future capital sentencing proceedings.

The majority states:

> Appellant's failure to object at the time the evidence was admitted effectively precluded the trial court from applying the evidentiary protections set forth in the capital sentencing statute, Md. Rule 5–404(b) and Md. Rule 5–403, *i.e.,* whether the prejudice of admitting the evidence outweighs its probative value. Our case law interpreting Md. Rule 5–404(b) clearly holds that the weighing component of the test for admitting other crimes evidence "implicates the exercise of the trial court's discretion." *Terry v. State,* 332 Md. 329, 335, 631 A.2d 424, 427 (1993) (quoting *State v. Faulkner,* 314 Md. 630, 635, 552 A.2d 896, 898 (1989)). Without an objection and the trial court's response in the record, we cannot say whether the trial court abused its discretion, and we will only reverse if the error caused substantial prejudice to Appellant.

Maj. op. at 181. The majority apparently recognizes that a trial court, when considering whether "other crimes" evidence is admissible in a capital sentencing hearing, should apply Maryland Rule 5–404(b) and the case law interpreting that rule, including *State v. Faulkner.* Under *Faulkner,* a court considering "other crimes" evidence is required to find (a) that the acts have special relevance; (b) that there is clear and convincing evidence that the acts occurred; and (c) that the probative value is not outweighed by unfair prejudice. 314 Md. at 634–35, 552 A.2d at 898.

The majority then proceeds, however, to analyze the admissibility of "other crimes evidence" under a different legal

standard. Citing *Hunt v. State*, 321 Md. 387, 431–32, 583 A.2d 218, 239 (1990), it states:

> Section 413(c)(v), governing the admissibility of evidence in a capital sentencing proceeding, provides the trial court with the authority to admit 'any ... evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.' Since Wanda Johnson and Lawrence Bradshaw were both shot with a .38 caliber handgun, Wilson's testimony in the sentencing proceeding that Appellant had a .38 caliber handgun and that they had pulled it out on each other helped the prosecution establish that Appellant was a principal in the first degree to Wanda Johnson's murder, which the State was required to prove under the death penalty statute. *See* § 413(e)(1). Moreover, in other capital sentencing proceedings we have upheld the admission of "other crimes" evidence after concluding that the evidence was appropriate for considering in whether to apply the death penalty. In *Hunt*, ... we explained why evidence of other crimes is treated differently in a capital sentencing proceeding than in the guilt/innocence phase of trial. "[The Defendant] stood before the court as a convicted murderer, not as an accused defendant entitled to the presumption of innocence. While irrelevant to the guilt/innocence phase of a criminal trial, [the defendant's] 'dangerousness,' as exemplified by his past conduct, was relevant in the sentencing phase of the trial." We do not suggest that any evidence of dangerousness or past violence is admissible; the trial court must evaluate the reliability of the evidence and its prejudicial impact on the defendant. Wilson's testimony in this case is not significantly prejudicial, and, as in *Hunt*, in this case the evidence is "reliable information ... which is of probative value and relevant to sentencing[,] ... [and] the defendant [was] accorded a fair opportunity to rebut any statements."

Maj. op. at 182 – 83 (citations omitted).

The legal test which the majority seems to craft would require a court to find that the evidence is probative and

relevant to sentence, and that the defendant is accorded a fair opportunity to rebut the evidence. In addition, the majority would have the court "evaluate the reliability of the evidence and its prejudicial impact on the defendant."

If the majority test does not include the clear and convincing evidence requirement of *Faulkner*, I disagree with this test. Section 413(c)(v) does not authorize the admission of other crimes evidence generally. Neither does *Hunt.*[2]

The majority ignores the clear holding of *Scott v. State*, 297 Md. 235, 249, 465 A.2d 1126, 1134 (1983), that in a capital sentencing proceeding, the type of admissible evidence is more circumscribed than in a non-death penalty case. It strain's

---

**2.** The portion of *Hunt* cited by the majority involves the admission of information contained within a presentence investigation report. Specifically, the trial court had admitted evidence of two letters written by Hunt referencing escape attempts, as well as "prison infraction reports which detailed his violations of prison rules forbidding inmates from possessing weapons." *Hunt v. State*, 321 Md. 387, 430, 583 A.2d 218, 239 (1990). The *Hunt* Court noted that a presentence investigation report is admissible in a capital sentencing proceeding *by statute*. *Id.*, 583 A.2d at 239; Art. 27, § 413(c)(iv). It is in this context that the *Hunt* Court held that "reliable information contained in a presentence investigation report, which is of probative value and relevant to sentencing, ordinarily is admissible provided the defendant is accorded a fair opportunity to rebut any statements." *Id.* at 431–32, 583 A.2d at 239.

The *Hunt* Court went on to consider whether this evidence constituted "uncharged criminal conduct." *Id.* at 433, 583 A.2d at 240. The Court looked to *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), in which this Court found reversible error after the trial court admitted evidence of two unrelated unadjudicated murders. *Id.*, 583 A.2d at 240. The *Hunt* Court then stated:

Hunt does not come under the umbrella of *Scott*. *Scott* involved criminal conduct outside of the prison setting. There is simply no comparison between the admission of a reliable report of prison conduct, which concededly occurred, and the admission of unadjudicated murder charges. The relevant reliable information about Hunt's institutional misconduct was admissible.

Id. at 433–34, 583 A.2d at 240. The *Hunt* Court recognized that there is "no comparison" between evidence of prison misconduct contained in a presentence report and evidence of unadjudicated criminal conduct. The majority's reliance on *Hunt* in the instant case, in the context of unadjudicated criminal conduct not included in a presentence investigation report and not involving prison conduct, is misplaced.

the reasoning of *Scott* to permit evidence of other crimes in death penalty sentencing proceedings based solely on a finding of relevance and fair opportunity to rebut and Rule 5–404(b) without at least applying the test set out in *State v. Faulkner*, 314 Md. 630, 552 A.2d 896 (1989) for admissibility of "other crimes" evidence. *See* McClain, Evidence (1994 ed.), *commentary*, Rule 5–404(b) ("This provision codifies the Maryland case law, under which evidence of prior acts will be admissible if proved by clear and convincing evidence, *e.g., State v. Faulkner*, 314 Md. 630, 634, 552 A.2d 896, 898 (1989), and if substantially probative of (having 'special relevance' to) some contested issue in the case, other than simply to show conduct 'in character.' "); *Scott*, 297 Md. at 246–52, 465 A.2d at 1132–35 (recognizing that the type of evidence admissible pursuant to the sentencing statutory scheme in a death penalty case is generally more restricted than evidence admissible at sentencing in a non-death penalty case and holding that § 413(c)(1)(ii) "precludes, in a death penalty case, any but the most reliable type of evidence of unrelated crimes—a conviction"); *see also Conyers v. State*, 345 Md. 525, 693 A.2d 781, 801 (1997) ("*Conyers I*") (recognizing *Scott*'s holding that § 413(c)(1)(i) and (iii) prohibit "the admission of evidence of unrelated crimes, in a death penalty case, if the defendant had not either been convicted of those crimes or entered a plea of guilty or nolo contendere.") [3]

Under the majority's reasoning, in order to admit "other crimes" evidence in a non-capital case, a court must find by clear and convincing evidence that the prior act occurred; yet, in order to admit that same evidence before a capital sentencing jury deciding the issue of life or death, the court need only find "reliable" evidence that the prior act occurred. Nonetheless, the two standards are not inconsistent. This Court made the determination that in the context of "other crimes" evidence, to be admissible the trial court must find by clear and

---

**3.** The defendant's criminal history is admissible by statute if it is contained in the pre-sentence investigation report. *See* Maryland Code (1957, 1997 Repl.Vol., 1998 Supp.), Article 41, § 4–609(d).

convincing evidence that the act(s) occurred. *See Cross v. State*, 282 Md. 468, 478–79, 386 A.2d 757, 763–64 (1978). Presumably, this standard ensures reliability. The protections of *State v. Faulkner*, governing the admissibility of evidence in criminal trials, in my view, are applicable in death sentencing proceedings.

As to the merits of the claim, the majority reasons:

[A]t least initially, the trial court may have considered the testimony favorable to Appellant. Wilson stated that only a week before the murder the couple had been fighting and that Wilson moved out of the home she shared with Appellant. The hostile break-up of the relationship could have been initially viewed as supporting a mitigating circumstance involving Appellant's emotionally disturbed state of mind at the time of the murder.

Maj. op. at 183. I find it untenable to conclude that the State's introduction of evidence of the hostile break-up of the Conyers–Wilson relationship could have been considered as mitigating evidence favorable to Conyers. At the very best, the evidence is a double-edged sword. Whether to introduce the evidence in question as a mitigator was Conyers's call, not one for the State.

### *Mitigating Circumstance of Sympathy or Mercy*

The majority holds that Appellant's claim of error regarding the trial court's instruction on mitigating circumstances was not preserved for review. Maj. op. at 166. I agree. The majority continues, however, and concludes that even if preserved, the instructions were thorough, and when viewed as a whole, precluded a juror "from not considering a factor he or she perceived as mitigating because it was not 'raised by the evidence.'" Maj. op. at 173. I disagree.

The jury was instructed as to non-statutory mitigating factors that "[a]ny factor causing you to feel sympathy or mercy toward the defendant may be considered by you as a mitigating circumstance so long as such factor *is raised by the*

*evidence.*" [4] Even though the jury was instructed that allocution is evidence, the instructions nonetheless improperly restricted the juror's consideration to *evidence.* The non-statutory, catch-all factor does not have to be based on evidence and thus, the instructions were inherently contradictory.

In assessing whether a sentencing instruction in a death penalty proceeding is invalid, the Supreme Court has stated that the test is

> 'what a reasonable juror could have understood the charge as meaning.' *Francis v. Franklin,* 471 U.S. 307, 315–16, 105 S.Ct. 1965, 1971–1972, 85 L.Ed.2d 344 (1985). To determine how a reasonable juror could interpret an instruction, we 'must focus initially on the specific language challenged.' *Francis v. Franklin,* 471 U.S. at 315, 105 S.Ct. at 1971. If the specific instruction fails constitutional muster, we then review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law.

*California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). The majority concludes that the instruction, when viewed as a whole, correctly informed the jury that in determining whether there were any mitigating factors, the jury could consider anything presented to them during the sentencing proceeding, including relevant and material conduct of the defendant up to and including this sentencing proceeding. The majority reasons that the thoroughness of the jury instructions "effectively precluded a juror from not considering a factor he or she perceived as mitigating because if was not 'raised by the evidence.' " Maj. op. at 173. This assertion, in my view, is unfounded.

---

**4.** The trial judge instructed the jury as to what constitutes evidence. The court instructed as follows:

> In making your decision, you must consider the evidence in this case. That is, the testimony from the witness stand, the physical evidence or exhibits that were admitted into evidence, the stipulations and the defendant's allocution.

Although it is not technically correct to state that allocution is evidence, in so defining evidence for the jury, the jury was permitted to consider the defendant's allocution as the basis of a non-statutory mitigator.

It is well settled in Maryland that the jury in sentencing proceedings is not confined to the evidence in determining the existence of a non-statutory mitigator. Writing for the Court in *Foster v. State,* 304 Md. 439, 474–75, 499 A.2d 1236, 1254 (1985), Judge Eldridge pointed out:

> A sentencing authority, unconvinced that death is appropriate, may list as a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued. If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances.

I believe that a rational juror could interpret the instruction given in this case as a requirement that a non-statutory mitigator must be based on evidence. The jury was presented with inconsistent instructions, creating a substantial likelihood that one or more jurors would interpret the court's instruction as a constraint upon his or her duty to consider mitigating factors. This is contrary to Maryland law, and as such, it is error. Where the jury instructions are inconsistent and partially incorrect, and a possibility of misunderstanding exists, we should conclude the instruction is invalid. Such is the case here.

The majority, in footnote 6, quotes from *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), presumably to suggest that mitigating circumstances must be based solely on *evidence* in the case. The cases do not support the majority's position.

In *Eddings,* the sentencing judge found as a matter of law that he was unable to consider evidence presented during the sentencing hearing as to the mitigating evidence of defendant's family history. *Id.* at 113, 102 S.Ct. at 876. The issue before the Supreme Court in that case was whether the trial judge improperly failed to consider the relevant, mitigating

evidence presented by the defendant, and not, as the majority states, whether mitigating factors must be based on evidence. *Id.,* 102 S.Ct. at 876. The Supreme Court found that the limitations placed by the Oklahoma courts upon the mitigating evidence they would consider violated the rule in *Lockett,* and held that a sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence. *Id.* at 113–15, 102 S.Ct. at 876–77. That is a far cry from holding that the sentencer may only consider evidence as support for a mitigating factor.

In *Lockett,* the Supreme Court explained that the rule the court was applying reflected "the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Id.* at 110, 102 S.Ct. at 874. The Court went on to hold that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Id.* at 112, 102 S.Ct. at 875.

I disagree with the majority's conclusion that once a jury is given a broad instruction as to what it should consider, that it is more likely that the jury would conclude that "evidence" consisted of *all* that they had seen and heard during the proceedings, *along with their opinions and impressions.* The jury had just participated in a sentencing hearing at which various documents and photographs were marked as exhibits and *admitted into evidence.* It is an equally, if not more plausible conclusion, that, given this experience during the sentencing hearing, the jury would have understood evidence simply to encompass the witnesses' testimony and physical exhibits. *Cf.* BLACK'S LAW DICTIONARY, *Evidence* (6 th ed.1990), "Any species of proof, or probative matter, legally presented at the trial of an issue, *by the act of the parties and through the medium of witnesses, records, documents, exhibits, concrete objects, etc. . .*" (emphasis added).

The instruction given by the trial court in this case is clearly erroneous and should neither be blessed by this Court, nor considered by trial judges as legally appropriate.[5]

---

**5.** This language is not contained in either the Maryland Criminal Pattern Jury Instructions or in D.E. AARONSON, MARYLAND CRIMINAL JURY

*Conclusion*

In sum, I would vacate the sentence of death and remand this case for a new sentencing proceeding because the trial court erred in permitting Detective Marll to express an opinion that key prosecution witness Charles Johnson was credible, and in restricting the direct examination of Rogers and McLee.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in the views expressed herein.

INSTRUCTIONS AND COMMENTARY (2d ed.1988). While 'trial courts are not required to follow slavishly pattern instructions, the safer course in death penalty proceedings is to conform to the pattern instructions. As to the form required by Md. Rule 4–343(g), the issue was not raised by either party and we should not consider its propriety.